### E. I. DU PONT DE NEMOURS & CO. ET AL. *v.* COLLINS ET AL.

No. 75–1870.   Argued March 2, 1977—Decided June 16, 1977*

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post*, p. 57. REHNQUIST, J., took no part in the consideration or decision of the cases.

*Daniel M. Gribbon* argued the cause for petitioners in No. 75–1870.   With him on the briefs were *Matthew J. Broderick* and *Richard S. Seltzer*.   *David Ferber* argued the cause for petitioner in No. 75–1872.   With him on the briefs were former *Solicitor General Bork, Acting Solicitor General Friedman, Jacob H. Stillman,* and *James R. Miller.*

*Richard J. Collins, Jr.,* respondent, argued the cause *pro se* and filed a brief in both cases.   *Lewis C. Murtaugh,* respond-

---

*Together with No. 75–1872, *Securities and Exchange Commission* v. *Collins et al.,* also on certiorari to the same court.

ent, argued the cause *pro se* in both cases. With him on the brief was *Timothy J. Murtaugh III*.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari [1] in these cases to determine whether the Securities and Exchange Commission, in approving the merger of a closed-end investment company into an affiliate company, reasonably exercised its discretion under the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.* The Commission valued the investment company essentially on the basis of the market value of the securities which constituted substantially all of its assets rather than on the lower basis of its own outstanding stock.

The statutory scheme here is relatively straightforward. Section 17 of the Investment Company Act of 1940, 15 U. S. C. § 80a–17, forbids an "affiliated person," as defined in the Act,[2] to purchase any securities or other property from a registered investment company unless the Commission finds, *inter alia,* that the "evidence establishes that . . . the terms of the proposed transaction, including the consideration to be paid or

---

[1] 429 U. S. 815 (1976).

[2] Title 15 U. S. C. § 80a–2 (a) (3) defines an "affiliated person" as follows:

"(3) 'Affiliated person' of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof."

received, are reasonable and fair and do not involve over-reaching on the part of any person concerned . . . ." [3]

## A

(1) The merger in this litigation involves Christiana Securities Co., a closed-end, nondiversified management investment company, and E. I. du Pont de Nemours & Co., a large industrial operating company engaged principally in the manufacture of chemical products. Christiana was formed in 1915 in order to preserve family control of Du Pont & Co. At the time the present merger negotiations were announced in April 1972, 98% of Christiana's assets consisted of Du Pont common stock.[4] This block of Du Pont stock in turn comprised approximately 28.3% of the outstanding common stock of Du Pont.[5] For purposes of this litigation, Christiana has been presumed to have at least the potential to control Du Pont, although it submits that "this potential lies dormant and unexercised and that there is no actual control relationship." SEC Investment Company Act Release No. 8615 (1974), 5 S. E. C. Docket 745, 747 (1974).

---

[3] Section 17 (b) also requires that the proposed transaction be (1) consistent with the policy of each registered investment company concerned, and (2) consistent with "the general purposes of this title." 54 Stat. 815, 15 U. S. C. §§ 80a–17 (b) (2), (3). These criteria are not contested here.

[4] Christiana owns 13,417,120 shares of Du Pont. It also holds a relatively small amount of Du Pont preferred stock. Its other assets consist of two daily newspapers in Wilmington, Del., and 3.5% of the stock of the Wilmington Trust Co., which, in turn, holds more than one-half of Christiana's common stock as trustee. SEC Investment Company Act Release No. 8615 (1974).

[5] According to the applicants' Notice of Filing of Application, SEC Investment Company Act Release No. 7402 (1972), Du Pont has 47,566,694 shares of common stock outstanding held by approximately 224,964 shareholders.

Christiana itself has 11,710,103 shares of common stock outstanding [6] and has about 8,000 shareholders. Unlike Du Pont stock, which is traded actively on the New York and other national stock exchanges, Christiana shares are traded in the over-the-counter market. Since virtually all of its assets are Du Pont common stock, the market price of Christiana shares reflects the market price of Du Pont stock. However, as is often the case with closed-end investment companies, Christiana's own stock has historically sold at a discount from the market value of its Du Pont holdings. [7] Apparently, this discount is primarily tax related since Christiana pays a federal intercorporate tax on dividends. Its stockholders are also subject to potential capital-gains tax on the unrealized appreciation of Christiana's Du Pont stock which has a very low tax base. Additionally, the relatively limited market for Christiana stock likely influences the discount.

In 1972, Christiana's management concluded that, because of the tax disadvantages and the discount at which its shares sold, Christiana should be liquidated and its stockholders become direct owners of Du Pont stock. Christiana's board of directors proposed liquidation of Christiana by means of a tax-free merger into Du Pont. Du Pont would purchase Christiana's assets by issuing to Christiana shareholders new certificates of Du Pont stock. In more concrete terms, Du Pont would acquire Christiana's $2.2 billion assets and assume its liabilities of approximately $300,000. In so doing, Du Pont would acquire from Christiana 13,417,120 shares of its own common stock. Du Pont would then issue 13,228,620 of its shares directly to Christiana holders. This would be

---

[6] Ninety-five and one-half percent of these shares are held by 338 people. SEC Investment Company Act Release No. 8615, *supra.*

[7] In the two years preceding the date of the announcement of the merger negotiations, this discount was generally in the range of 20%–25%. *Ibid.*

188,500 shares less than Du Pont would receive from Christiana. As a result of the merger, each share of Christiana common stock would be converted into 1.123 shares of Du Pont common stock. That ratio was ascertained by taking the market price of Christiana's Du Pont stock and its other assets, subtracting Christiana's relatively nominal liabilities, and making certain other minor adjustments. Direct ownership of Du Pont shares would increase the market value of the Christiana shareholders' holdings and Du Pont would have acquired Christiana's assets at a 2.5% discount from their net value. The Internal Revenue Service ruled the merger would be tax free.

(2) Du Pont and Christiana filed a joint application with the Commission for exemption under § 17 of the Investment Company Act. Administrative proceedings followed. The Commission's Division of Investment Management Regulation supported the application. A relatively small number of Du Pont shareholders, including the respondents in this case, opposed the transaction. Their basic argument was that, since Christiana was valued on the basis of its assets, Du Pont stock, rather than the much lower market price of its own outstanding stock, the proposed merger would be unfair to the shareholders of Du Pont since it provides relatively greater benefits to Christiana shareholders than to shareholders of Du Pont. The objecting stockholders argued that Du Pont & Co. should receive a substantial share of the benefit realized by Christiana shareholders from the elimination of the 23% discount from net asset value at which Christiana stock was selling. They also argued that the merger would depress the market price of Du Pont stock because it would place more than 13 million marketable Du Pont shares directly in the hands of Christiana shareholders.

After the hearing, the parties waived the initial administrative recommendations and the record was submitted

directly to the Commission. The Commission unanimously granted the application. Basically, it viewed the proposed transaction as an exchange of equivalents—Christiana's Du Pont stock to be acquired by Du Pont in exchange for Du Pont stock issued directly to Christiana shareholders. It held that, for purposes of § 17 (b), the proper guide for evaluating Christiana was the market price of Christiana's holdings of Du Pont stock:

> "Here justice requires no ventures into the unknown and unknowable. An investment company, whose assets consist entirely or almost entirely of securities the prices of which are determined in active and continuous markets, can normally be presumed to be worth its net asset value. . . . The simple, readily usable tool of net asset value does the job much better than an accurate gauge of market impact (were there one) could." 5 S. E. C. Docket, at 751.

The fact that Du Pont might have obtained more favorable terms because of its strategic bargaining position or by use of alternative methods of liquidating Christiana was considered not relevant by the Commission. In its view, the purpose of § 17 was to prevent persons in a strategic position from getting more than fair value. The Commission found no detriment in the transaction to Du Pont or to the value of its outstanding shares. Any depressing effects on the price of Du Pont would be brief in duration and the intrinsic value of an investment in Du Pont would not be altered by the merger. Moreover, in the Commission's view, any valuation involving a significant departure from net asset value would "run afoul of Section 17 (b)(1) of the Act"; it would strip long-term investors in companies like Christiana of the intrinsic worth of the securities which underlie their holdings.

A panel of the United States Court of Appeals for the Eighth Circuit divided in setting aside the Commission's

determination. *Collins* v. *SEC,* 532 F. 2d 584 (1976).[8] The majority held that the Securities and Exchange Commission had erred, as a matter of law, in determining that Christiana should be presumptively valued on the basis of the market value of its principal asset, common stock of Du Pont. "[I]n judging transactions between dominant and subservient parties, the test is 'whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.' *Pepper* v. *Litton,* 308 U. S. 295, 306–307 . . . (1939)." *Id.,* at 592. Employing this standard, the Court of Appeals majority concluded that the record did not support the Commission's finding that the terms of the merger were "reasonable and fair" since the "economic benefits to Christiana shareholders from the merger are immediate and substantial," *id.,* at 601, while "benefits to present Du Pont shareholders are minimal." *Id.,* at 602. The court concluded that, from Du Pont's viewpoint, "the degree of [control] dispersion attained . . . does not justify the substantial premium paid for the Christiana stock." *Id.,* at 603. The panel also held that the Commission had erred in failing to give weight to the "occasional detriment to Du Pont shareholders," *id.,* at 605, caused by the increase of available Du Pont stock in the market.

## B

In determining whether the Court of Appeals correctly set aside the order of the Commission, we begin by examining the nature of the regulatory process leading to the decision that court was required to review. In *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694 (1975), we noted that the Investment Company Act of 1940, 15 U. S. C. § 80a–1 *et seq.,* "vests in the SEC broad regulatory authority over the business practices of the investment companies." 422 U. S., at 704–705. The Act was the product of congressional concern

---

[8] A petition for rehearing en banc was denied by an equally divided court.

that existing legislation in the securities field did not afford adequate protection to the purchasers of investment company securities. Prior to the enactment of the legislation, Congress mandated an intensive study of the investment company industry.[9] One of the problems specifically identified was the numerous transactions between investment companies and persons affiliated with them which resulted in a distinct advantage to the "insiders" over the public investors.[10] Section 17 was the specific congressional response to this problem.[11] Congress therefore charged the Commission, in scrutinizing a merger such as this, to take into account the peculiar characteristics of such a transaction in the investment company industry. Recognizing that an "arm's length bargain," cf. *Pepper* v. *Litton,* 308 U. S. 295, 307 (1939), is rarely a realistic possibility in transactions between an affiliate and an investment company, Congress substituted, in effect, the informed judgment of the Commission to determine, *inter alia,* whether the transaction was "reasonable and fair and [did] not involve overreaching on the part of any person concerned." [12]

Given the wide variety of possible transactions between an investment company and its affiliates, Congress, quite understandably, made no attempt to define this standard with any greater precision. Instead, it followed the practice frequently employed in other administrative schemes. The

---

[9] Section 30 of the Public Utility Holding Company Act, 49 Stat. 837, 15 U. S. C. § 79z–4, mandated that the SEC undertake such a study. See *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 704 (1975).

[10] See generally Report on Investment Trust and Investment Companies, H. R. Doc. No. 279, 76th Cong., 1st Sess., 1017–1561 (1940).

[11] While the House and Senate Reports indicate that the Congress' chief concern was protection of the public investors of the investment company, S. Rep. No. 1775, 76th Cong., 3d Sess., 11–12 (1940); H. R. Rep. No. 2639, 76th Cong., 3d Sess., 9 (1940), the statute has been construed to afford protection to the stockholders of the affiliate as well. See *Fifth Avenue Coach Lines, Inc.,* 43 S. E. C. 635, 639 (1967).

[12] 15 U. S. C. § 80a–17 (b) (1).

language of the statute was cast in broad terms and designed to encompass all situations falling within the scope of the statute; an agency with great experience in the industry was given the task of applying those criteria to particular business situations in a manner consistent with the legislative intent.[13]

## C

In this case, a judgment as to whether the terms of the merger were "reasonable and fair" turned upon the value assigned to Christiana. In making such an evaluation, the Commission concluded that "[t]he single, readily usable tool of net asset value does the job much better than an accurate gauge of market impact. . . ." 5 S. E. C. Docket, at 751. Investment companies, it reasoned, are essentially a portfolio of securities whose individual prices are determined by the forces of the securities marketplace. In determining value in merger situations, "asset value" is thus much more applicable to investment companies than to other corporate entities. The value of the securities surrendered is, basically, the real value received by the transferee.

In reviewing a decision of the Commission, a court must consider both the facts found and the application of the relevant statute by the agency. Congress has mandated that, in review of § 17 proceedings, "[t]he findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U. S. C. § 80a–42. A reviewing court is also to be guided by the "venerable principle that the construction

---

[13] This situation is quite different from that which confronted the Court earlier this Term in *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1 (1977). There, the Court held that "the narrow legal issue" of implying a private right of action under the securities laws was "one peculiarly reserved for judicial resolution" and that the experience of the Commission on such a question was of "limited value." *Id.,* at 41 n. 27. By contrast, this case involves an assessment as to whether a given business arrangement is compatible with the regulatory scheme which the agency is charged by Congress to administer.

of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969). "[C]ontemporaneous construction is entitled to great weight . . . even though it was applied in cases settled by consent rather than in litigation." *FTC* v. *Mandel Bros.*, 359 U. S. 385, 391 (1959). Here, however, the Court of Appeals held, as a matter of law, that the Commission erred in the method applied in passing on the merger, thus all but ignoring the congressional limitations on judicial review of agency action.

The Commission has long recognized that the key factor in the valuation of the assets of a closed-end investment company should be the market price of the underlying securities. This method of setting the value of investment companies is, as Congress contemplated, the product of the agency's long and intimate familiarity with the investment company industry. For instance, in issuing an advisory report to the United States District Court pursuant to § 173 of Chapter X of the Bankruptcy Act, the Commission advised that "it is natural that net asset value based upon market prices should be the fundamental valuation criterion used by and large in the investment company field." *Central States Electric Corp.*, 30 S. E. C. 680, 700 (1949), approved *sub nom. Central States Electric Corp.* v. *Austrian*, 183 F. 2d 879, 884 (CA4 1950), cert. denied, 340 U. S. 917 (1951). Similarly, in mergers like the one presented in this litigation, the Commission has used "net asset value" as a touchstone in its analysis. See, *e. g., Delaware Realty & Investment Co.*, 40 S. E. C. 469, 473 (1961); *Harbor Plywood Corp.*, 40 S. E. C. 1002 (1962); *Eastern States Corp.*, SEC Investment Company Act Releases Nos. 5693 and 5711 (1969).[14]

---

[14] This method of valuation of closed-end investment companies was similarly employed in *ELT, Inc.*, SEC Investment Company Act Releases

Moreover, despite the characterization of the Court of Appeals to the contrary, the Commission did not employ a mechanical application of a rule or "presumption." It considered carefully the contentions of the respondents that a departure from the use of net asset value was warranted in this case. Upon analysis, it concluded that the central and controlling aspect of the merger remained the fact that it consisted of an exchange of Du Pont common stock for Du Pont common stock; it was not Christiana stock but Du Pont stock which Du Pont was receiving in the merger. As to the claim that Du Pont stock would be adversely affected over an extended period of time by volume selling, the Commission concluded there was no indication of a long-term adverse market impact. It noted that Christiana stock was held principally by long-term investors. There was no evidence that Christiana stockholders, who for years had been indirect investors in Du Pont, would now change the essential nature of their investment.

The Commission's reliance on "net asset value" in this particular case and its consequent determination that the proposed merger met the statutory standards thus rested "squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts.

Nos. 8675 and 8714 (1975); *Chemical Fund, Inc.*, SEC Investment Company Act Releases Nos. 8773 and 8795 (1975); *Citizens &. Southern Capital Corp.*, SEC Investment Company Act Releases Nos. 7755 and 7802 (1973); *Detroit & Cleveland Nav. Co.*, SEC Investment Company Act Releases Nos. 3082 and 3099 (1960); *Cheapside Dollar Fund, Ltd.*, SEC Investment Company Act Releases Nos. 9038 and 9085 (1975). The Commission has, of course, required that such valuations be adjusted to reflect such factors as expenses of the merger and tax considerations. *Talley Industries, Inc.*, SEC Investment Company Act Release No. 5953 (1970); and *Electric Bond & Share Co.*, SEC Investment Company Act Release No. 5215 (1967), cited by the Court of Appeals, did not rely on net asset value since the companies held substantial assets other than securities. While Christiana also had some assets other than Du Pont stock, they amounted to only 2% of its assets.

It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts." *SEC* v. *Chenery Corp.*, 332 U. S. 194, 209 (1947). In rejecting the conclusion of the Commission, the Court of Appeals substituted its own judgment for that of the agency charged by Congress with that responsibility.

We note that after receiving briefs and hearing oral argument, the Court of Appeals—over the objection of the Commission, Christiana, and Du Pont—undertook the unique appellate procedure of employing a university professor to assist the court in understanding the record and to prepare reports and memoranda for the court. Thus, the reports relied upon by that court included a variety of data and economic observations which had not been examined and tested by the traditional methods of the adversary process. We are not cited to any statute, rule, or decision authorizing the procedure employed by the Court of Appeals. Cf. Fed. Rule App. Proc. 16.

In our view, the Court of Appeals clearly departed from its statutory appellate function and applied an erroneous standard in its review of the decision of the Commission. The record made by the parties before the Commission was in accord with traditional procedures and that record clearly reveals substantial evidence to support the findings of the Commission. Moreover, the agency conclusions of law were based on a construction of the statute consistent with the legislative intent. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of these cases.

MR. JUSTICE BRENNAN, dissenting.

Section 17 of the Investment Company Act of 1940, 15 U. S. C. § 80a–17, prohibits transactions between registered

investment companies and "affiliated persons," except as the Securities and Exchange Commission approves such transactions on application, if, *inter alia,* "the terms of the proposed transaction, including the consideration to be paid or received, are reasonable and fair and do not involve overreaching on the part of any person concerned." § 80a–17 (b). The SEC approved the application of Christiana Securities Co. (Christiana) to merge into E. I. du Pont de Nemours & Co. (Du Pont), finding that the proposed transaction met the statutory standard.

Christiana was created in 1915 to concentrate the Du Pont family's holdings of Du Pont stock. Its assets consist almost entirely of Du Pont common stock, of which it holds 28.3% of the total outstanding. It is thus an investment company within the meaning of the Act, and an affiliate of Du Pont subject to the prohibitions of § 17. Although ownership of Christiana stock is essentially indirect ownership of Du Pont stock, Christiana stock is traded over-the-counter at a considerable discount from the market price of the corresponding shares of Du Pont.

For reasons unnecessary to elaborate here, Christiana is no longer regarded by its owners as a desirable control mechanism. Moreover, the tax laws make it expensive to maintain, since dividends from Du Pont are taxed when paid to Christiana, and again when passed on to the shareholders as dividends from Christiana. Elimination of Christiana is therefore desirable to its shareholders, and an agreement was reached to effectuate this goal by merging Christiana into Du Pont.[1] The terms of this agreement are set forth in the Court's opinion, *ante,* at 49–50, but in effect, Du Pont acquired its own shares from Christiana at about a 2.5% discount from

---

[1] Liquidation of Christiana would also have accomplished the desired result, without involving Du Pont or the prohibitions of § 17, but was apparently ruled out by Christiana because of disadvantageous tax consequences for its shareholders.

their market price, while Christiana's shareholders eliminated their costly holding company, without incurring any tax liability.[2]

It is conceded that while the primary concern of Congress in enacting the Act was the protection of investment company shareholders, § 17 (b) does not permit the SEC to authorize a transaction that is unfair to the affiliated person, any more than one that is unfair to the investment company. *Fifth Avenue Coach Lines, Inc.,* 43 S. E. C. 635 (1967). See the opinion of the Court, *ante,* at 53 n. 11.[3] The SEC found here that the transaction was fair to Du Pont's shareholders, essentially because they paid slightly less than the net asset value of Christiana. In this sense, it is true that Du Pont paid for Christiana no more than it is intrinsically "worth," and so the price could be considered "fair." However, in a market economy, the value of any commodity is no more nor less than the price arm's-length bargainers agree on. Christiana and Du Pont were not arm's-length bargainers,[4] and it is obvious that if they had been, Du Pont would have insisted on, and would have had the bargaining power to obtain, a more favorable price. Instead, the directors of Du Pont accommodated the desires of Christiana, owner of a control block of Du Pont stock, without requiring the *quid pro quo*

---

[2] In contrast to the disadvantageous tax consequences of alternative means of disposing of Christiana, see n. 1, *supra,* the Internal Revenue Service had ruled that the proposed merger with Du Pont would be tax free. *Ante,* at 50.

[3] In order to be approved, the transaction must "not involve overreaching on the part of *any* person concerned." 15 U. S. C. § 80a–17(b) (emphasis supplied).

[4] Christiana owned a potentially controlling share of Du Pont. As the Court concedes, *ante,* at 53, an arm's-length bargain "is rarely a realistic possibility" in such a situation. While "Du Pont did take some steps to simulate arm's-length bargaining," 532 F. 2d 584, 598 (1976), the Court of Appeals made short shrift of their significance, *id.,* at 598–601, and the Court places no reliance on them.

they would undoubtedly have demanded from any other seller.

I do not mean to suggest that the SEC should not, as a general rule, look to the net asset value of an investment company in evaluating the fairness of transactions such as this. At least where the result of the transaction is the elimination of the investment company, the party that acquires it gets the full value of its holdings, and not just a block of stock in the investment company; the asset value thus seems in the usual case a better measure of the investment company's value than the market price of its stock. On the other hand, in a situation such as this, the depressed market price of Christiana stock may well reflect its undesirability to its present holders.[5] Even if the stock is for some reason still desirable to the purchaser, this undesirability can be translated into a benefit to him because it gives him bargaining leverage to obtain a better price.[6]

---

[5] In addition to the tax on intercorporate dividends, as the Court recognizes, *ante*, at 49, other disadvantages to the continued maintenance of Christiana might have been reflected in the low market price of its stock, such as the potential for high capital-gains taxation and the relative illiquidity of Christiana stock, for which there is a more limited market than for Du Pont.

[6] The SEC's argument that § 17 was intended "to prevent persons in a strategic position from getting more than fair value," *ante*, at 51, is a mere play on words. As the legislative history, examined at length by the Court of Appeals, 532 F. 2d, at 591–592, makes plain, § 17 was intended to protect minority interests from exploitation by insiders of *their* "strategic position," and to restore a situation in which "the directors of the several corporations involved in negotiations for a merger . . . are acting at arm's length in an endeavor to secure the best possible bargain for their respective stockholders." SEC, Report on Investment Trusts and Investment Companies, H. R. Doc. No. 279, 76th Cong., 1st Sess., 1414 (1940). Far from being intended to negate factors that would give one party a "strategic bargaining position" in arm's-length bargaining in the free market, the Act was specifically intended to give those factors free play, uncorrupted by insiders' desires to benefit themselves rather than the stockholders as a whole.

However accurate asset valuation may be in most contexts, each determination of what is fair and reasonable and free of overreaching must by the nature of the inquiry turn on the facts of the particular transaction involved.[7] I would hold that the SEC applied an erroneous standard in this case by presuming that in the absence of actual detriment to the purchaser, a transaction that recognizes the net asset value of an investment company is fair and reasonable. In my view the correct standard required the SEC to compare the terms of the transaction with those that would have been reached by arm's-length bargainers.[8] Here, Du Pont's directors, who were in the conflict-of-interest situation with which the Act is concerned because of Christiana's position as a controlling shareholder of Du Pont, entered a transaction that handsomely benefited Christiana, without extracting the price for Du Pont that an arm's-length negotiator would have demanded and received.[9] I therefore disagree with the SEC's

---

[7] Since this is so, one might well wonder what "special and important reasons" exist for this Court to decide "whether the Securities and Exchange Commission . . . reasonably exercised its discretion" in a particular case. *Ante*, at 47. See this Court's Rule 19.

[8] Although the SEC did recognize the possibility that there might be cases in which an exception to the "net asset value" rule would be appropriate, its inquiry in this litigation turned entirely on the possible detriment of this transaction to Du Pont's shareholders. No attempt was made to determine what the results of arm's-length bargaining might have been. The Court of Appeals, correctly in my view, held that such an inquiry should have been made. Accordingly, the Court of Appeals held that the agency had applied an erroneous legal standard, and no question of invasion of the area of SEC expertise is presented.

[9] It may appear harsh to insist that, in the absence of actual detriment to its other shareholders, Du Pont press its advantage, rather than accommodate Christiana. But in accommodating Christiana, Du Pont's directors were not merely being "nice guys" in a disinterested fashion, at no cost to anyone. They were giving special consideration to an investment company that holds a controlling share of Du Pont. This is precisely the evil at which § 17 was directed.

holding that this behavior was fair and reasonable to Du Pont, or free from overreaching on the part of Du Pont's controlling shareholder, Christiana. Accordingly, I would affirm the judgment of the Court of Appeals.