**ANDERSON SHIPPING COMPANY, et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Lee M. Thomas, Administrator, and United States of America, Respondents.**

No. 87–1705.

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1988.

Decided Aug. 5, 1988.

Richard A. Kulics, Birmingham, Ala., for petitioners.

Peter W. Colby, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., Dept. of Justice, and Ralph Colleli, Atty., E.P.A., Washington, D.C., were on the brief, for respondents.

Before ROBINSON, RUTH BADER GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In September of 1987, the Environmental Protection Agency ("EPA"), issued new regulations drastically revising the existing regulatory program for importation of vehicles not certified as conforming to federal emission requirements (nonconforming vehicles) under the Clean Air Act, 42 U.S.C. §§ 7401–7642 ("the Act"). Petitioners, corporations engaged in the business of importing such vehicles and/or conforming such vehicles to United States standards, contend that the new regulations are unlawful and urge us to set them aside. Because the new regulations are a reasonable exercise of EPA's authority under the Clean Air Act, we deny the petition.

## I. BACKGROUND

Title II of the Act governs emissions from moving sources. Part A, 42 U.S.C. §§ 7521–7551, provides the framework for the regulation of emissions from motor vehicles [1] operated in the United States. Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), specifically prohibits the importation of "new motor vehicles" unless each such vehicle is covered by a certificate of conformity issued under regulations made pursuant to the Act. The term "new motor vehicle" under the Act includes any vehicle manufactured after the effective date of a regulation issued under § 7521 applicable to such vehicle or which would

have been applicable had it been manufactured for importation in the United States. This effectively covers all gasoline powered passenger cars manufactured during or after 1968. See 52 Fed.Reg. 36,155 (Sept. 25, 1987). Therefore, import passenger cars manufactured since 1968 are "new vehicles" at the time of importation and are subject to prohibition under § 7522(a).

The prohibition created by § 7522(a)(1) is subject to such exception as is "provided in subsection (b) of [Section 7522]." Id. Section 7522(b)(2) provides that the Secretary of the Treasury and the Administrator may promulgate regulations allowing the importation of nonconforming motor vehicles under terms and conditions "as may appear to them appropriate to insure that" the nonconforming vehicle will be brought into conformity. Id.

In 1972, the EPA and the Treasury (through the U.S. Customs Service) first promulgated regulations under this section allowing importation of nonconforming vehicles. See 37 Fed.Reg. 24,250 (Nov. 15, 1972). The EPA regulations (40 C.F.R. §§ 85.1501–1509 (1985)) applied to all "new" vehicles without further reference to their age when imported and required that they be modified to meet the same standards as a U.S. certified [2] version of the vehicle, or modified and individually tested to demonstrate compliance with appropriate emission standards. 40 C.F.R. § 85.1504 (1985). Those regulations permitted any person to import nonconforming vehicles provided they were modified according to the conformity regulations.

In 1981, the EPA created a specific exception to this rule. It adopted an enforcement policy allowing the importation by individuals on a one time per person basis for personal use only and not for resale of one vehicle, five model-years old or older.[3] Any other "new" vehicle, even five years old or older, that did not meet all the condi-

---

**1.** Wherever the word "vehicles" appears hereinafter it includes motor vehicles and motor vehicle engines, as does the Act, unless the context plainly indicates otherwise.

**2.** That is, a vehicle originally manufactured for importation into the United States and certified

as meeting U.S. standards at the time of manufacture. See 42 U.S.C. § 7522.

**3.** This policy was subsequently published in the Federal Register, 48 Fed.Reg. 16,485 (April 18, 1983).

tions of the policy remained subject to the modification and testing requirements of the regulation.

During the first half of the 1980's, the EPA wrestled with all the policy considerations surrounding the question of nonconforming vehicles and specifically the question of how to deal with the perceived abuses by importers and other problems arising under the existing program. *See* 45 Fed.Reg. 48,812 (July 12, 1980). After two prior notices and solicitation of comments, *see* 45 Fed.Reg. 48,812 (July 12, 1980) and 48 Fed.Reg. 50,902 (Nov. 4, 1983), the EPA issued a supplemental proposal which became the primary basis for the regulations under attack in this petition. 50 Fed.Reg. 36,838 (Sept. 9, 1985). In September of 1987, EPA promulgated the final revised import regulations now before the Court. 52 Fed.Reg. 36,136–36,-164. These new regulations provide that a nonconforming vehicle can be imported only by an independent commercial importer (ICI). An ICI is an importer who is not an original equipment manufacturer or an authorized distributor for an original equipment manufacturer, and must hold valid certificates of conformity issued by the EPA. The revised regulations further require that nonconforming imported vehicles must be modified to meet emission standards not only when tested immediately prior to their official release for use in this country, but for a period of five years or 50,000 miles (whichever comes first) from the sale of the vehicle to the ultimate purchaser or release to the owner after importation and modification or testing. 52 Fed. Reg. 36,151. The new regulations also abolish the personal use exemption created by the 1981 enforcement policy.

## II. ANALYSIS

Petitioners attack the regulations in shotgun fashion, scattering criticism randomly across the EPA's bow. Since we find that none of petitioners' pellets inflicts any wound mortal to the new regulatory scheme, we will deny the petition for the reasons set out below.

### A. *The Independent Commercial Importer*

■ Petitioners' first claim of error in the EPA's new rule is based on the creation of the status of independent commercial importer. Petitioners claim that this rulemaking is contrary to law because it conflicts with the "customhouse" broker provision of the Tariff Act, 19 U.S.C. § 1484. That section provides, in pertinent part, that "the importer of record" must be a party eligible to file documentation required by that section, such as customs declarations. 19 U.S.C. § 1484(a)(2)(C). Since, in effect, only a licensed customhouse broker can perform this function (other than an owner or purchaser acting on his own behalf), petitioners argue that the EPA regulations conflict with this statute by creating a new kind of "importer" who is not required to be able to meet the requirements for becoming a "importer of record" under the customs statute. However, this problem is more imaginary than real. As the EPA noted in a footnote to the preamble to the regulations:

> it should be noted that an importer for purposes of these regulations does not necessarily comport with "importer of record" for purposes of the Tariff Act of 1930.... Under EPA's amended regulations period the importer must be a certificate holder and need not be the owner, purchaser or an authorized customhouse broker, as provided for in the Tariff Act.

The duties of the two are different.[4] The ICI is to see that the imported vehicle meets the clean air standards. The importer of record is to see that the goods imported (whether or not vehicles) properly clear customs. The EPA can look to the ICI.

---

**4.** We note in passing, as mentioned above, that Treasury has joint responsibility for issuance of regulations in this area. We were informed by counsel during the pendency of this appeal that the U.S. Customs Service was in the process of promulgating new regulations to complement the new EPA regulations. After oral argument, but before issuance of this opinion, the Customs Service did in fact issue such new regulations amending 19 C.F.R. Part 12. 53 Fed.Reg. 26,238 (July 12, 1988).

The Treasury can look to the importer of record. Importers of record, when acting commercially, are customhouse brokers. Customhouse brokers customarily act for others. There is no reason one of those others cannot be an ICI. Petitioners' argument on this point is so thin that if the term of art chosen by EPA had not included the word "importer" it could hardly be made. It is not surprising that an argument so dependent upon a semantic element is almost totally lacking in substance.

### B. *The "Useful Life" Questions*

As noted above, the new regulations require not only the attainment of emissions standards at the time of release for use in the United States but also for their useful life, 5 years or 50,000 miles computed from the date of import or release into the United States. 52 Fed Reg. 36,157, ¶ 85.1502(14). Petitioners assert several difficulties with this regulation, two of which warrant some specific discussion. First, petitioners assert, the 5–year/50,000 mile useful life definition in the statute is jurisdictional and EPA has no power to regulate a vehicle exceeding that standard at the time of import. Second, the EPA's specific application of the 5–year/50,000 mile useful life formula in the present regulatory framework is contrary to the intent of Congress and invalid under the statute. We find these two interrelated arguments to be without merit.

### 1. Jurisdiction

■ The source of the 5–year/50,000 mile definition of useful life is 42 U.S.C. § 7521(d)(1). That section prescribes those numbers as defining "useful life" of passenger cars for purposes of § 7521(a)(1) and § 7541. Petitioners argue that this definitional section is jurisdictional as to the emission requirement regulatory power of the EPA. However, the actual regulatory jurisdiction of the EPA over import vehicles in relevant context is addressed by 42 U.S.C. § 7522(a)(1) which prohibits the importation of any nonconforming "new motor vehicle" except as provided by regulation of the Administrator. As noted in Section I, *supra* of this opinion, the statu-

tory definition of "new vehicles" is tied not to their useful life but to their manufacture during or after 1968. 42 U.S.C. § 7550(3). The broader view of the statutory scheme supports EPA's jurisdiction. Section 7522(a)(1), as noted, flatly prohibits the importation of the nonconforming new vehicle except as provided by the Administrator's regulations. Subsection (b)(2) provides broad discretion to the Administrator, acting jointly with the Secretary of the Treasury, to set such terms and conditions under those regulations as may seem to them appropriate. Since the limitation of the applicability of those regulations is expressed in (a)(1) only in terms of "new motor vehicles" and not in terms of useful life, we will not imply a limitation on this power which Congress has not stated. In short, the useful life provisions of § 202 of the Act, 42 U.S.C. § 7521(d)(1), do not jurisdictionally limit the power of EPA to regulate imports of vehicles manufactured in or after 1968.

### 2. The Specific Useful Life Regulations

■ Petitioners further oppose the EPA's specific treatment of the 5–year/50,000 mile line of demarcation as being beyond and inconsistent with the intent of Congress, if not jurisdictionally, at least in the sense that Congress, by establishing that definition of useful life in 42 U.S.C. § 7521, expressly limited the EPA's power to regulate emissions to vehicles of or under that age or mileage. The argument assumes, quite reasonably, that useful life begins at manufacture. As to domestically produced automobiles, this may well be the only proper measure. As to import vehicles, it may not be.

While the EPA claims plenary authority to begin the useful life of the import vehicle whenever it wishes, we do not have to approve that expansive a reading of EPA's authority to approve the regulation before us. The EPA has consistently interpreted the useful life provision as making it clear that Congress was concerned about the effects of air pollution from motor vehicles and other sources for a reasonable time after their commencement of use in the

United States. Not only nonconforming but certified conforming vehicles must meet emissions standards for the same time or mileage measure after their entry into this country. *See* 52 Fed.Reg. 36,151. The legislative history of the Clean Air Act Amendments of 1970 supports the Agency's conclusion that Congress was concerned with emission equipment that would last for a use period in this country rather than with what the actual expected useful life of an automobile might be. Congress had before it information to the effect that the actual useful life of an automobile could reasonably be expected to exceed the statutory useful life, but that cost effective, anti-emission technology should be expected to meet something like the 50,000 mile test. *See* A Legislative History of the Clean Air Act Amendments of 1970, 93d Cong., 2d Sess. at 332 (Comm.1974). Therefore it is not unreasonable to apply the same logic and conclude that a purchaser paying for the importation and conforming technology of a vehicle produced in another country would expect to use it at least for a similar useful life period. Neither is it unreasonable for the regulator to require that the importing purchaser protect the air, consistent with congressional goals, for as long as the purchaser of a domestic vehicle.

Finally, in response to both prongs of petitioners' attack on the 5–year/50,000 mile regulation, EPA notes that it has since 1970 regulated import vehicles "new" within the meaning of the statute without regard to their actual age or mileage when imported. We are inclined to give considerable weight to this longstanding Agency interpretation of the statute entrusted to its administration. *See E.I. Du Pont De Nemours & Co. v. Collins*, 432 U.S. 46, 54–56, 97 S.Ct. 2229, 2234–35, 53 L.Ed.2d 100 (1977). In support of this we note that we have previously held that Congress has never expressed any intent to expand the reach of the 5–year/50,000 mile limitation of the statute beyond its facially applicable terms. *See General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985).

## C. *The Trade Agreements Act*

Petitioners next assert that the new regulations constitute discriminatory treatment of imported as opposed to domestically manufactured automobiles and that such discrimination is prohibited by 19 U.S.C. § 2532. For two reasons we will not reach the merits, if any, of this argument. In the first place, petitioners raise this question for the first time before the Court. No other commentor raised this question at the administrative stage. Congress has provided explicitly "only an objection to a rule or procedure which was raised with reasonable specificity during the period of public comment (including any public hearing) may be raised during judicial review." Section 307(d)(7)(B) of the Act; 42 U.S.C. § 7607(d)(7)(B). Petitioners' objection, even if otherwise valid, comes too late. *Cf. NRDC v. Thomas*, 805 F.2d 410, 427–28 (D.C.Cir.1986).

Even if timely made, this objection by petitioners is not cognizable. The Trade Agreements Act not only provides no express private right of action for alleged violations of § 2532, but expressly declares that neither that statute itself nor any agreement approved pursuant to it "shall be construed as creating any private right of action or remedy for which provision is not explicitly made under" that chapter or other laws. 19 U.S.C. § 2504(d). More specifically, 19 U.S.C. § 2551 expressly states that "[e]xcept as provided under [subpart 1 of Part C, Chapter 13 of Title 19 U.S.Code], the provisions of [19 U.S.C. § 2532, *et seq.*] do not create any right of action under the laws of the United States with respect to allegations that any standards, related activity engaged in within the United States violates the obligations of the United States under the Agreement." Sections 2552 and 2553 accord with the quoted sections by establishing that review is had upon receipt from a party to the agreement or another foreign country not a party to the agreement which has extended reciprocal rights and privileges to the United States. None of the importers and vehicle modifiers who petition us is a foreign

country, let alone a signator to the agreement. Petitioners simply lack standing to assert this argument.

### III. CONCLUSION

Petitioners offer other arguments in addition to those discussed above. None of these warrants separate discussion, let alone action by us setting aside the EPA regulations. In short, petitioners have shown us nothing warranting a setting aside of the EPA's regulations and the petition is therefore denied.