OPINION OF THE COURT
Sheila Abdus-Salaam, J.
This is an application by petitioners and by petitionersintervenors, pursuant to CPLR article 78, seeking to vacate, set aside and annul a determination by respondent New York State Liquor Authority (the SLA or the Authority) granting the issuance of a liquor license to respondent-intervenor, Wooster & Grand, Inc. (Wooster). Respondents cross-move to dismiss on the ground of lack of standing and failure to state a cause of action.
The proposed licensed establishment, a club for dancing, is situated at 72 Grand Street located in New York City’s landmark SoHo neighborhood. The SLA approved Wooster’s application for a liquor license by a vote of two to one (Commissioner Gedda, dissenting). The December 6, 1995 decision — a conclusory one-sentence determination that liquor licenses are in the "public interest” because they generate employment and tax revenues — was adhered to by the SLA on March 13, 1996. Petitioners contend that respondent’s determination was made in violation of lawful procedure, was affected by error of law, and was arbitrary and capricious and an abuse of discretion (CPLR 7803 [3]). Specifically, petitioners assert that the determination violated section 64 (7) (b) of the Alcoholic Beverage Control Law,* which provides as follows:
"No retail license for on-premises consumption shall be granted for any premises which shall be * * *
"within five hundred feet of three or more existing premises licensed and operating pursuant to the provisions of this section” (the 500-foot rule).
The Authority granted Wooster’s application for issuance of a liquor license despite the existence of approximately 22 bars within 500 feet of the proposed licensed premises — a clear violation of the 500-foot rule — and despite the fact that the application for a liquor license was overwhelmingly opposed by hundreds of residents, community groups, galleries and other businesses, and several of New York’s State and City public officials.
The Authority attempts to justify its determination based upon a discretionary waiver of the 500-foot rule contained in *634 Alcoholic Beverage Control Law § 64 (7) (f) which provides as follows: "Notwithstanding the provisions of paragraph (b) of this subdivision, the authority may issue a retail license for on-premises consumption for a premises which shall be within five hundred feet of three or more existing premises licensed and operating pursuant to the provisions of this section if, after consultation with the municipality or community board, it determines that granting such license would be in the public interest. Before it may issue any such license, the authority shall conduct a hearing, upon notice to the applicant and the municipality or community board, and shall state and file in its office the reasons therefor” (emphasis added).
Where, as here, there already are more than three licensed premises within 500 feet of the applicant’s premises, subdivision (f) imposes an obligation upon the Authority to find, after "consultation” with the municipality or community board and with publicly filed "reasons,” that an additional license is in the "public interest”. Here, the SLA issued a conclusory one-sentence determination that liquor licenses are in the "public interest” because they generate employment and tax revenues. There were no findings made as to how much (if any) additional employment and tax revenues would be generated by the granting of this particular license to Wooster; indeed, there is absolutely no evidence on the record to support this conclusion, which apparently is based on a philosophical predisposition to grant such applications and then discipline the licensed premises, utilizing the SLA’s enforcement powers, if they became the subject of public complaints.
On March 18, 1996, State Senator Padavan — who, in 1993, sponsored section 64 (7) (b) and the "public interest” provision therein — wrote a letter to respondent Casale informing the latter that the determination violated both the letter and intent of the Alcoholic Beverage Control Law. Senator Padavan wrote: "[T]he SLA ha[s] the sole authority to grant an exception to the 500 feet rule, but only after a public hearing and only if it found granting the license would be in the public interest. Clearly, the intent of this legislation was to allow for a waiver only if the community was supportive of the request for same * * * A case in point is granting a waiver for 72 Grand Street in Soho in spite of overwhelming community opposition. As the basis for such waiver, the Authority claimed that the public interest was served because the liquor establishment would generate jobs and revenue to the state. It is self-evident that this would be the case every time a liquor establishment ap *635 plies for and is granted a license. However, this rationale contravenes not only the intent but the very law itself as passed in 1993. I cannot conceive of a Court upholding the Authority’s determination of a waiver in light of legislative history as outlined above when there is no community support for it.”
In an article 78 proceeding, the reviewing court does not act as a rubber stamp, but, rather, exercises a genuine judicial function and does not confirm a determination simply because it was rendered by an administrative agency (see, 300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 181).
I find that respondent’s determination that the granting of Wooster’s application for a liquor license was "in the public interest” was in violation of the letter and spirit of the Padavan Law and was made in violation of lawful procedure, was affected by error of law, and was arbitrary and capricious and an abuse of discretion (CPLR 7803 [3]). There is no basis whatsoever in the record to support respondent’s determination. Indeed, in the absence of any evidence in the record to the contrary, it would seem more logical, in view of the plethora of existing licensed premises within 500 feet of Wooster’s establishment, that adding another such premises would result in cutting the economic pie into smaller pieces rather than creating a larger pie, which seems to be .the premise upon which the SLA’s conclusion was based. Even were there evidence to support the conclusion that the granting of a license to Wooster would create more jobs and tax revenue, it is clear that the Authority did not engage in any balancing of the possible benefit to the public from more jobs and taxes as opposed to the possible detriment to the community by adding another liquor establishment in an area already saturated with such establishments. Nor did the SLA give any heed to the grounds for the near unanimous community opposition to the granting of this particular liquor license, as evidenced by a vote by Community Board No. 2 against issuance of the license, including the following:
"expert acoustic and traffic reports showing that a club with dancing would increase noise levels in adjacent residential units to levels exceeding the City’s Noise Code and would generate unduly large amounts of traffic on the narrow cobble-stoned street on Wooster Street; [and]
"affidavits by experts in the arts field who swore to the deleterious effect of the plan.”
Furthermore, it appears that misrepresentations were made by Wooster’s counsel at the 500-foot hearing (at which nobody *636 except applicant and its counsel and architect spoke in support of the application). At that meeting, applicant’s counsel, Francis Buscemi, orally represented to the Authority that there would be no dancing or dance club at 72 Grand Street. As was later pointed out to the Authority, these representations were inconsistent with a then-pending application with the New York City Board of Standards and Appeals to permit dancing at 72 Grand Street. At that hearing, applicant’s counsel also referred to (1) a June 1995 acoustic report by an acoustic firm (the Acoustilog Report) to allegedly show that the noise generated by any club would have no effect on the club’s neighbors, and (2) a traffic study that showed that no traffic problems would be generated by the proposed club. However, the traffic study was based not on actual field studies but on estimates provided by the applicant to its traffic consultant. However, expert reports from acoustic and traffic consultants demonstrated that the Acoustilog Report and the applicant’s traffic study were unreliable, and concluded that applicant’s Acoustilog Report assumed decibel levels that were "the equivalent decibel level of a loud television set” and was "seriously deficient in a number of respects” and that decibel levels in applicant’s Acoustilog Report were "flatly unrealistic;” and that "noise levels that will be generated from this establishment and patron-associated noise will likely exceed the levels estimated by the Acoustilog report.” After performing traffic counts and studies at comparable establishments, these experts concluded that applicant’s traffic projections "significantly underestimate” vehicular traffic and "there is a real potential for waiting taxi cabs to block traffic completely along this street, resulting in unacceptable congestion (this street is not wide enough to allow vehicles to pass stopped taxi cabs).”
At the reconsideration hearing, applicant’s counsel conceded that applicant had failed to disclose in its license application the fact that a group of individuals from Staten Island retained a 40% interest — by way of a seller-take-back mortgage — in the premises at which the club would operate. However, question 16 (a) of the license application requested disclosure of "any interest, financial, proprietary or other, direct or indirect, in the premises or in the business to be licensed” by persons other than applicant.
The SLA also ignored affidavits swearing that a bar/dance club at 72 Grand Street would have a disastrous effect on the special, unique art-based neighborhood. These included affidavits submitted by the following persons: Christopher Burge, *637 Chairman, Christie’s; Richard Brick, film producer and former New York City Commissioner for Film, Theatre and Broadcasting (and a resident of 70 Grand Street); Pierre Clerk, internationally renowned sculptor and painter (and a resident of 70 Grand Street); Willem Dafoe, actor and member, the Wooster Group, at the Performing Garage (31-33 Wooster Street); Donald H. Elliott, former Chairman of City Planning and expert in land use regulation; Maxwell K. Hearn, Curator, Department of Asian Art, the Metropolitan Museum of Art (and a longtime resident of 74 Grand Street); and Ann Philbin, Director, the Drawing Center (35 Wooster Street).
The conflict between the proposed use and the surrounding neighborhood was not just a theoretical possibility: "If the Special Permit [to allow an eating and drinking establishment with dancing] is granted, the Drawing Center will strongly reconsider its decision to remain at 35 Wooster Street * * * Real estate brokers regularly inquire whether the Drawing Center is interested in considering space elsewhere. I have previously had no intention of moving but am strongly reconsidering in light of the present perception that SoHo is declining as an arts center generally, and this application for a Special Permit [for an eating and drinking establishment with dancing] specifically.” (Philbin affidavit 8.)
Willem Dafoe, an actor and leading member of an internationally recognized theater group that performed less than 50 feet from the proposed liquor establishment, submitted an affidavit that: "The increase in human and vehicular traffic and associated noise caused by a club that permits dancing and entertainment directly across the street will have disastrous consequences for the Wooster Group and the Performing Garage * * * If a Special Permit [to allow an eating and drinking establishment with dancing] is granted and the Wooster Group’s performances and rehearsals hindered — as we believe they will — we will have no option but to reevaluate our decision to stay at this location.” (Dafoe affidavit fifí 7, 9.)
The Chairman of Christie’s stated: "I note that the establishment will open directly across the street from the Drawing Center at 35 Wooster Street and the Performing Garage at 31-33 Wooster Street. As Chairman of Christie’s and a SOHO resident I can unqualifiedly state that these organizations are among the best in the world in their respective fields. If this Special Permit [for an eating and drinking establishment with dancing] is granted — and the operations of these organizations hindered — it would be an extremely potent and devastating blow to the neighborhood and the art world."
*638 Petitioner Clerk, a sculptor for over three decades and one who had received national and international acclaim, swore:
"[M]y work will suffer. I am currently working on several important sculptures that will be exhibited this spring. Already, I am finding it increasingly difficult to concentrate due to the noise caused by the bars and clubs and the time and effort it takes to stop yet further encroachment by these night establishments into this neighborhood. My conversations with dozens of artists over the last few years confirms that those artists are experiencing problems similar to mine * * *
"From this apartment I have painted and made sculpture, to national and international acclaim. My life and success as an artist depends upon the peace and quiet normally associated with Wooster Street. However, a drinking and dancing establishment literally across the street from where I sleep and work late into the night will have a disastrous effect on my art and my health.” (Clerk affidavit ¶¶ 9, 11.)
Richard Brick, former City Commissioner for Film, Theatre and Broadcasting, swore to the late hours that he worked producing film and the negative effect that the licensed liquor establishment would have on his work. (Brick affidavit 3, 4.) Furthermore, nonartist resident neighbors also swore to the adverse effect of a licensed liquor establishment. (Hearn affidavit 8 ["The occupants of our building include four full-time artists — all of whom work late into the night and the early hours of the morning — an art gallery, and five children. If a late-night drinking and dancing establishment were to open next door many of our building’s residents have told me that they will leave. The very viability of our coop is thus endangered by this application.”].) Even a former Chairman of City Planning submitted an affidavit on the incompatibility between a licensed drinking and dancing establishment and the surrounding neighborhood and the deleterious effect that over-saturation of licensed liquor establishments would have on this unique neighborhood. Thus, Donald H. Elliott — who was Chairman of City Planning when the M1-5B district was created— stated:
"[R]ecently, late night entertainment establishments which were — and remain — incompatible with the use of these districts as centers for the arts, art-related uses and residential occupation, have begun to proliferate * * *
"Based upon my experience as Chairman of the Commission when the M1-5B district was created, my understanding of the purpose behind the zoning regulations to encourage the *639 district’s art-based development, and my knowledge of the increased use of M1-5B districts for residential use, it is my opinion that the grant of a Special Permit [to permit an eating and drinking establishment with dancing] here would seriously impair the present character and future use of the surrounding residential and mixed use neighborhood.” (Elliott affidavit 1Í1Í5, 10.)
Yet, despite all of this evidence, the Authority has adopted an interpretation of the Alcoholic Beverage Control Law that is arbitrary and capricious. The Authority conclusorily found that employment and tax revenues would be generated by approval. But, as Senator Padavan informed respondent Casale, this is an erroneous interpretation of section 64 (7) (b) because most, if not all, licensed establishments will employ people and (presumably) pay taxes to the State of New York. By adopting this interpretation of the Alcoholic Beverage Control Law, the Authority has — by administrative fiat — written out vital sections of the Alcoholic Beverage Control Law — the intent of which was to prevent local communities from becoming oversaturated with licensed liquor establishments. If the Authority’s interpretation of "public interest” is correct, then the 500-foot rule will be wholly eviscerated and rendered a dead letter.
An administrative agency’s interpretation of a statute which it is responsible for administering is entitled to great weight (Matter of Howard v Wyman, 28 NY2d 434, 438), and, if not irrational or unreasonable, should be upheld (Matter of Sigety v Ingraham, 29 NY2d 110, 114). "A reviewing court is * * * guided by the 'venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong’ ” (du Pont de Nemours & Co. v Collins, 432 US 46, 54-55). In considering the proper deference to be given to an administrative ruling "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control” (Skidmore v Swift & Co., 323 US 134, 140). Administrative agencies can only promulgate rules to further the implementation of the law as it exists; they have no authority to create a rule out of harmony with the statute (Matter of Jones v Berman, 37 NY2d 42, 57). An agency may not, under the guise of administering the statute, ascribe a different or unreasonable meaning to its terms (Mat *640 ter of Rosenbluth v Finkelstein, 300 NY 402). An administrative agency cannot by regulatory flat directly or indirectly countermand a statute enacted by the Legislature (Servomation Corp. v State Tax Commn., 51 NY2d 608, 612). As Judge Pound held: "Laws are made by the law-making power and not by administrative officers acting solely on their own ideas of sound public policy, however excellent such ideas may be” (Matter of Picone v Commissioner of Licenses of City of N. Y., 241 NY 157, 162).
Under Alcoholic Beverage Control Law § 64 (7) (b), if the Authority determines that an additional on-premises liquor license is in the "public interest”, the Authority "shall state and file in its office its reasons therefor”. Here, the one-sentence general conclusion that a liquor license will generate employment and tax revenues does not constitute "reasons” why this particular license at this particular location is in the "public interest”. The Authority’s failure to specify reasons is thus an error of law, arbitrary and capricious and an abuse of discretion.
The Legislature enacted Alcoholic Beverage Control Law § 64 (7) (b) to alleviate the problems caused by the oversaturation of neighborhoods by late night bars and clubs. The Authority is duty bound to enforce the statute consistent with legislative intent — and not enter into a strained, tortured and irrational interpretation to pursue its own administrative and extra-legislative fiscal policy (Matter of Barry v Connell, 303 NY 46).
The SLA’s argument that its approval of the liquor license complied with subdivision (1) of section 64 which permits issuance of a license "upon good cause shown” is without merit.
Accordingly, the application of petitioners is granted and the determination of respondents New York State Liquor Authority et al., issuing an on-premises liquor license to the operators of the proposed establishment at 72 Grand Street, is vacated and annulled and they are directed to cancel said license forthwith, and the cross motion of respondents to dismiss the petition is denied.

 Alcoholic Beverage Control Law § 64 (7) (b) has been nicknamed the "Padavan Law” after the bill’s sponsor State Senator Frank Padavan.