Robert Haven PAYNE, Plaintiff,

v.

FEDERAL LAND BANK OF COLUMBIA; Mountain Federal Land Bank Association; Mountain Farm Credit Services; Maxie Love, Jr., in his capacity as President of the Federal Land Bank of Columbia; and Edwin E. Frizzell, in his capacity as Executive Vice President and Chief Credit Manager of the Mountain Farm Credit Services, Defendants.

Civ. No. A–C–88–145.

United States District Court, W.D. North Carolina, Asheville Division.

April 17, 1989.

C. David Gantt, Asheville, N.C., for plaintiff.

Steven Kropelnicki, Jr., Asheville, N.C., for defendants.

## MEMORANDUM OF DECISION

RICHARD L. VOORHEES, District Judge.

THIS MATTER is before the Court on motions filed by parties to this litigation. Arguments were heard on November 7, 1988, in Asheville, North Carolina.

Plaintiff, Robert Haven Payne, is a farmer in Madison County, North Carolina. Federal Land Bank of Columbia ("Federal") came into possession of property he used to own. He had pledged it as security for a loan which went into default, at which time Federal foreclosed the property and bought it at the foreclosure sale. On April 21, 1988, Federal sent Payne a certified letter informing him that it intended to sell the property at auction, and offering him the opportunity to match the high bid and repurchase the property. Payne did not bid at the auction or match the high bid, and the property was duly sold to a third party. Subsequently, Payne's financial position apparently improved to the point where he would be able to pay a reasonable price for the property. He prays that the Court set aside the auction sale and permit him to repurchase the property from the Bank.

It appears the sale to the third-party purchaser has not been fully consummated, perhaps because of the instant lawsuit. Plaintiff filed a *lis pendens* as provided for by North Carolina law, so his rights may be protected as against that purchaser as well.

The facts being undisputed, the issue is whether the bank fulfilled the statutory requirement to offer Payne the "right of first refusal" on the property before selling it to a third party. Defendant Federal claims it did so by offering to permit Plaintiff to match the high bid at the auction and purchase the property at that price. Plaintiff claims he had a right to be offered the property at a private sale before the auction took place. The relevant statute is that part of the Agricultural Credit Act of 1987 which is codified at 12 U.S.C. 2219a, and reads in pertinent part as follows:

§ 2219a. Right of first refusal

(a) General rule

Agricultural real estate that is acquired by an institution of the System as a result of a loan foreclosure or a voluntary conveyance by a borrower (hereinafter in this section referred to as the "previous owner") who, as determined by the institution, does not have the financial resources to avoid foreclosure (hereinafter in this section referred to as "acquired real estate") shall be subject to the right of first refusal of the previous owner to repurchase or lease the property, as provided in this section.

(b) Application of right of first refusal to sale of property

(1) Election to sell and notification

Within 15 days after an institution of the System first elects to sell acquired real estate, or any portion of such real estate, the institution shall notify the previous owner by certified mail of the owner's right—

(A) to purchase the property at the appraised fair market value of the property, as established by an accredited appraiser; or

(B) to offer to purchase the property at a price less than the appraised value.

(2) Eligibility to purchase

To be eligible to purchase the property under paragraph (1), the previous owner must, within 30 days after receiving the notice required by such paragraph, submit an offer to purchase the property.

(3) Mandatory sale

An institution of the System receiving an offer from the previous owner to purchase the property at the appraised value shall, within 15 days after the receipt of such offer, accept such offer and sell the property to the previous owner.

(4) Permissive sale

An institution of the System receiving an offer from the previous owner to purchase the property at a price less

than the appraised value may accept such offer and sell the property to the previous owner. Notice shall be provided to the previous owner of the acceptance or rejection of such offer within 15 days after the receipt of such offer.

(5) Rejection of offer of previous owner

(A) Duties of institution

An institution of the System that rejects an offer from the previous owner to purchase the property at a price less than the appraised value may not sell the property to any other person—

(i) at a price equal to, or less than, that offered by the previous owner; or

(ii) on different terms and conditions than those that were extended to the previous owner,

without first affording the previous owner an opportunity to purchase the property at such price or under such terms and conditions.

. . . .

(c) Application of right of first refusal to leasing of property

(1) Election to lease and notification

Within 15 days after an institution of the System first elects to lease acquired real estate ... the institution shall ... [remainder of subsection (c) omitted]

. . . .

(d) Public offerings

(1) Notification of previous owner

If an institution of the System elects to sell or lease acquired property or a portion thereof through a public auction, competitive bidding process, or other similar public offering, the institution shall notify the previous owner, by certified mail, of the availability of the property. Such notice shall contain the minimum amount, if any, required to qualify a bid as acceptable to the institution and any terms and conditions to which such sale or lease will be subject.

(2) Priority

If two or more qualified bids in the same amount are received by the institution under paragraph (1), such bids are the highest received, and one of the qualified bids is offered by the previous owner, the institution shall accept the offer by the previous owner.

## I. THE LANGUAGE OF THE STATUTE

This case turns entirely on the correct interpretation of the above statutory language. "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Subsection (a), the "General Rule", states that alienation of covered property is subject to the previous owner's right to "repurchase or lease" the property. Obviously his first-refusal right to "lease the property" applies to subsection (c). The right to "repurchase," then, applies to both (b) and (d), the direct-sale and auction-sale subsections; both involve selling, as opposed to leasing, the property. If (a) referred only to (b) rather than to (d), more specific language could have been used, to make it clear that the "repurchase" right applied only to direct sales.

A similar conclusion can be drawn by looking at the structure of the statute. Subsections (b), (c), and (d) are structurally at an equal level; no one of them is made subservient to another. If, as Plaintiff suggests, the provisions of (b) must be applied before those of (d), then it would have been more logical to have made (d) a sub-subsection, under (b), thereby making it structurally inferior. The fact that it was not suggests that (d) was intended to be co-equal with (b), and to have just as great a scope. This is further implied by the fact that both are structurally co-equal with the leasing subsection, (c); nobody suggests that (c) cannot be applied independently of either sale provision. Also, if the clauses were to be applied sequentially, rather than either/or, there was nothing to stop Congress from inserting a sentence to that effect in (d), such as: "But no public auction or competitive bidding process shall be held under the terms of this subsection

until the procedures for a direct sale under subsection (b) shall have been invoked." Such statutory language is quite common, where Congress intends the operation of one piece of language to be contingent on the operation of another. The fact that no such language is present here is highly significant.

Another structural clue is the ordering of subsections (b), (c), and (d). If the auction-sale subsection were (c), directly following (b), it might be possible to read them as being intended to be applied sequentially. In fact, (c) is the lease provision, recognized by all parties as having nothing to do with either (b) or (d) and operating independently. If (d) is inferior to (b), why then is the lease provision sandwiched in between them? The only logical explanation is that it did not matter in what order (b), (c), and (d) were listed, because they are independent and equal; they could have been listed in any other order to the same effect.

We turn now to the specific language of subsection (d). It is true that the interpretation Defendant Federal urges, and which this Court adopts, is a bit strained and requires applying a judicial gloss to the language. However, the rival interpretation is not only also strained, but strained beyond the breaking point. Courts must sometimes engage in a bit of gap-filling when the literal language of a statute does not make sense. "If two or more qualified bids in the same amount are received ... the institution shall accept the offer by the previous owner." If interpreted literally, this language would be only so much wasted paper and ink, as it could never have any occasion for application. When could there be two bids "in the same amount?" At the normal sort of knock-down auction, where bidders call out their bids orally to the auctioneer, each bid is required to exceed the previous one. In a competitive sale by sealed bid, it would only be by pure accident if two bids were in the same amount, as the competitors are not supposed to know the amount of each other's bids (and if they do, it is usually due to illegal bid-rigging). Thus, the subsection, by its terms, would have no applicability at all to the "public auction[s]" to which it

refers, and scant applicability to sealed-bid sales. This flies in the face of the basic rule that all parts of the statute should be given effect, and no part is to be rendered inoperative or superfluous. *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582–83, 6 L.Ed.2d 859 (1961). The language makes much more sense if "bids in the same amount" refers to an offer, after the fact, by the previous owner to match the high bid. The language then has application to every competitive sale, just as (b) applies to every direct sale and (c) to every leasing arrangement.

The preferred interpretation of (d) also leads to a result which gives the previous owner similar rights to the ones he is given in direct sales and leases. A review of the language in (b) and (c) shows that whenever the bank has completed an arrangement with a third party, the previous owner has the right to step into the shoes of that third party and deal with the bank on the same terms. The common sense of this principle is obvious. The bank is not hurt because it gets the same terms it was willing to take in any event; as between the newcomer third party and the previous owner, the previous owner is legislatively preferred because he may well have emotional ties to the land, friends and family in the area, established local economic contacts and the like. Exactly the same thing happens under the interpretation of (d) favored by Federal and this Court. The previous owner has a chance to step into the shoes of the high bidder. Indeed, it is important to note that nothing morally unfair happened to Payne, nor does it in the case of any other previous owner whose former property is auctioned off in this manner. Just like those who see their one-time estate offered for private sale or for rent, once the bank makes its deal with the third party, they have that one chance to step in and retake possession. Robert Payne did not avail himself of this opportunity, perhaps because he did not have the money at the time. However, he cannot now demand another chance. The law favors permanent alienation of property. Buyers cannot be forced to forever look over their shoulders

to see if someone is going to take their holdings out from under them.

There are other reasons why Plaintiff's position here is untenable. If the institutions of the System were to be forced to go through the appraisal process every time they wished to sell off foreclosed property (as they would have to do if use of subsection (b) were a required antecedent to use of subsection (d)), the burden upon them would be considerable. It is not clear what Congress had in mind when it spoke of having property appraised by an "accredited appraiser." First, there is nothing in the statute to say who is supposed to hire the appraiser. Presumably it would be either the bank or the former owner. In examining this question, it is first necessary to understand a few things about the real estate business.

It is common knowledge in land and lending circles that appraisers can be selected with a view toward valuation of a given property that is congenial to the employing party. This arrangement is neither anomalous nor uncommon. This is why many evaluation provisions in real estate contracts are drafted to permit each side to choose an appraiser, the two of whom in turn choose a third; the resulting three appraisals then being averaged. Given this fact of life, could Congress have meant to permit the former owner to name the appraiser? Hardly; that would be tantamount to enabling the former owner to name his own price for the property, and would be quite unfair to the bank. However, if it is the bank that hires the appraiser, the former owner's rights under subsection (b) become illusory. If the bank wishes to sell at auction anyhow, it need only hire an appraiser who will put a suitably unrealistically high price on the property. The owner would then of course refuse to pay that price, and the bank could then continue on to a subsection (d) auction.

The Court does not believe Congress intended to create such an illusory right, especially as it would bring about a situation where additional complications and expenses (in the form of the appraiser's fee) would have to be dealt with, only to reach the same eventual result that would be obtained anyway under the interpretation this Court adopts—an auction sale. Instead, it makes much more sense to think that the appraisal process of subsection (b) was intended to apply in situations where there is no animosity between the bank and the former owner and where the bank is willing to deal with the former owner and agree on a mutually acceptable process for setting an agreeable price. In such a situation, both sides might well be able to agree on an appraiser and agree to be bound by his valuation. Of course, this conclusion requires some reading between the lines. But, when dealing with an unclear and awkwardly drafted statute such as this one, that is inevitable.

Nor, for the same reasons, could subsection (b) logically refer to just any extant appraisal at the option of the previous owner. It often happens that two or more appraisals are available, assigning varying values, and made by appraisers with varying degrees of "accreditation." Surely Congress meant to permit an institution of the System to avoid this morass by choosing to proceed under subsection (d) when it sees fit.

Further illogicalities would flow from the interpretation Plaintiff urges. The previous owner's right to match the high bid under subsection (d) would also be illusory. As observed, it would literally never apply at a knockdown auction where each bid must exceed the previous one. It would almost always be quixotic for the previous owner to attempt to exercise his right at a sealed-bid contest, since only by accident would his bid exactly match that of another bidder. Even to enter a sealed bid would be quite dangerous for him. He might wind up being the high bidder, locked into an enforceable contract to purchase the property. Entry of a bid pursuant to an invitation to submit bids constitutes an offer that creates a contract if accepted. J. Calamari & J. Perillo, *The Law of Contracts*, § 2–9 (2d ed. 1977). This clearly goes against the grain of the rest of the statute, which obviously contemplates the previous owner being permitted to know

what terms a third party has arranged before deciding whether or not to step into the third party's shoes. In other words, subsection (d) would give the previous owner no rights at all (other than a tie-breaker in a sealed-bid sale) that he did not already have; the previous owner would, of course, have the same right as any other would-be purchaser to enter the auction. In a statute which is clearly designed to protect previous owners and give them rights which they would not otherwise have, an interpretation that would render an entire subsection a virtual nullity must be avoided if there is any reasonable alternative. The interpretation which Federal puts forward, and which this Court adopts, is such a reasonable alternative.

## II. ADMINISTRATIVE REGULATIONS

The Farm Credit Administration ("FCA") has published administrative regulations dealing with the issue presented here. Its ruling on the matter in dispute here was issued; the relevant language is as follows:

> FCA states that nothing in the legislative history or the actual language of the 1987 Act requires that a private sale be held prior to a public auction. Congress only intended that the previous owner be given a reasonable opportunity to repurchase the property before it is sold to a third party. This can be accomplished by either the private sale provision or the public auction provision. FCA asserts that paragraph (a) sets forth the *general* rule that acquired property is subject to the right of first refusal. Paragraphs (b) through (d) set forth procedures to implement the general rule in various situations. FCCA [sic] further asserts that the legislative debate, particularly in the Senate Subcommittee on Agricultural Credit of the Senate Committee on Agriculture, Nutrition and Forestry that authored the language on first refusal rights eventually adopted by Congress, confirms that Congress intended to create two independent, not sequential, rights of first refusal.

> FCA believes that the language in the proposed regulation correctly reflects the intent of the Act. There are three rights of first refusal available, as stated in paragraphs (c), (d), and (e) [sic]. (Note: should read, "(b), (c), and (d)".) Nothing in the legislative history persuades FCA that these rights must be provided sequentially. The relevant language originated in the Senate, where it was stated that "the former owner be given *one* opportunity to lease back or buy back his property." The previous owner is not prejudiced as long as he is afforded his right of first refusal *either* in the public auction process *or* by private sale or lease. In both instances, the previous owner is given priority by the institution. However, the System would be prejudiced if an institution is required to provide these rights subsequent to each other. An institution should be afforded the right to sell land publicly or privately in order to get the best price in its judgment, depending on market conditions. To deprive an institution of this right will harm not only the lender, but the entire System and prices of agricultural real estate as well. FCA is mindful of the district court decisions, both of which are on appeal.

Loan Policies and Operations, 53 Fed.Reg. 35,427 (Farm Credit Admin.1988) (final rule). (Emphasis in original.) (The district court decisions referred to will be discussed *infra.*)

The logic of the above seems compelling. Of course, the FCA does not have the power to change the meaning of an act of Congress by publishing a regulation that is contrary to it. However, the reasoning by which FCA concluded that Congress had intended the stated result is persuasive. Similarly, Congressional intent cannot be overridden by a finding that something other than what Congress meant would have been more logical. When there is room for question as to just what Congress did mean, as there is here, it is fair to assume that Congress intended a fair and reasonable result rather than an unfair and unreasonable one. The notion that the statute is remedial and ought to be construed in cases of doubt in favor of the previous owner does not require that reason and

practicality be banished from the process of interpretation. The FCA's observations that only the interpretation it takes leads to a just and smoothly-functioning result are compelling, and the Court adopts them.

This is just what a court is expected to do in a case like this. A recent Fourth Circuit case neatly summarized the significance of agency interpretations. Although in a dissenting opinion, the analysis represents good law (indeed, it could hardly be otherwise, as the analysis consists entirely of Supreme Court precedent); the disagreement with the majority was based on other points. In *Holt Co. v. International Brotherhood of Electrical Workers*, 868 F.2d 671, 680 (4th Cir.1989), Judge Phillips observed:

> In the face of ... patent ambiguities, we must first give deference to "reasonable" agency interpretations of the relevant statute. "A reviewing court is ... to be guided by the 'venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....'" *E.I. duPont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–55 [97 S.Ct. 2229, 2234, 53 L.Ed.2d 100] (1977), (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381 [89 S.Ct. 1794, 1801, 23 L.Ed.2d 371] (1969)). Indeed, our role is highly circumscribed. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844 [104 S.Ct. 2778, 2782, 81 L.Ed.2d 694] (1984), and courts "should not disturb" an agency's interpretation "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367 U.S. 374, 383 [81 S.Ct. 1554, 1560, 6 L.Ed.2d 908] (1961). "The court need not conclude that the agency construction was the only one it permissively could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11 [104 S.Ct. at 2782 n. 11] (citations omitted). Instead, courts must determine only whether the agency's interpretation of the statute is "reasonable." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 [98 S.Ct. 2441, 2445, 57 L.Ed.2d 337] (1978).

The FCA's position regarding the statute in question more than meets the standard. It is eminently reasonable, and it is the conclusion the Court would have arrived at on its own without agency guidance. Nor is there anything conclusive in the statute itself to say that "the accommodation is not one that Congress would have sanctioned;" *see* the analysis of the statutory language in Section I, *supra.* Thus, the only thing that could invalidate the regulation would be clear evidence to the contrary from the legislative history. As will be seen in the next section, the legislative history does not contain the "smoking gun" Plaintiff needs to invalidate the FCA's action.

## III. LEGISLATIVE HISTORY

It should be noted at the outset that the modern trend is that legislative history is increasingly regarded with suspicion in cases involving statutory interpretation. The D.C. Circuit, having jurisdiction as it does over cases that arise in the Nation's capital, is frequently faced with interpretation problems, and has expertise second only to the Supreme Court's in dealing with them. Justice Antonin Scalia, while still a circuit judge, noted in one case:

> I frankly doubt that it is ever reasonable to assume that the details, as opposed to the broad outlines of purpose, set forth in a committee report come to the attention of, much less are approved by, the house which enacts the committee's bill. And I think it time for courts to become concerned about the fact that routine deference to the detail of committee reports, and the predictable expansion in that detail which routine deference has produced, are converting a system of judicial construction into a system of committee-staff prescription.

*Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C. Cir.1985), (concurring opinion) (footnote omitted). Chief Judge Patricia Wald, of the same Court, has observed that "consistent and uniform rules for statutory construction and use of legislative materials are not being followed today. It sometimes seems that citing legislative history is still, as my late colleague Harold Leventhal once observed, akin to 'looking over a crowd and picking out your friends.'" "Some Observations on the Use of Legislative History in the 1981 Supreme Court Term," 68 Iowa L.Rev. 195, 214 (1983). This has become the standard view on that Court. "Committee reports, we remind, do not embody the law. Congress, as Judge Scalia recently noted, votes on the statutory words, not on different expressions packaged in committee reports." *Abourezk v. Reagan,* 785 F.2d 1043, 1054 n. 11 (D.C.Cir.1986) (citing *Hirschey*). *See also Federal Election Commission v. Rose,* 806 F.2d 1081, 1089–90 (D.C.Cir.1986). Other circuits have joined this view:

> The fact of the matter is that legislative history can be cited to support almost any proposition, and frequently is. The propensity of judges to look past the statutory language is well known to legislators. It creates strong incentives for manipulating legislative history to achieve through the courts results not achievable during the enactment process. The potential for abuse is great....
>
> ....
>
> ... Reports are usually written by staff or lobbyists, not legislators; few if any legislators read the reports; they are not voted on by the committee whose views they supposedly represent, much less by the full Senate or House of Representatives; they cannot be amended or modified on the floor by legislators who may disagree with the views expressed therein. Committee reports that contradict statutory language or purport to explicate the meaning or applicability of particular statutory provisions can short-circuit the legislative process, leading to results never approved by Congress or the President.

*Wallace v. Christensen,* 802 F.2d 1539, 1559–60 (9th Cir.1986) (Kozinski, J., concurring).

All of this seems to recognize what has been summarized recently: "Lobbyists and lawyers maneuver endlessly to persuade staff members (who write the committee reports) and/or their legislative bosses to throw in helpful language in the reports when insertion of similar language would be inappropriate or infeasible for the statute itself. 'Smuggling in' helpful language through the legislative history is a time-tested practice of the D.C. bar." W. Eskridge and P. Frickey, *Legislation: Statutes and the Creation of Public Policy,* Ch. 7, § 3A(2) p. 710 (1988).

Consequently, it is with a certain amount of healthy skepticism that we should undertake to analyze the legislative history of the statute in question.

The starting point, and the piece of legislative history which should be given the most weight, is the relevant committee report. It is more authoritative than remarks in committee meetings or on the floor. "Most scholars and judges agree that committee reports should be considered as authoritative legislative history and should be given great weight (*i.e.,* a statement in a committee report will usually count more than a statement by a single legislator)." *Id.* at Ch. 7, § 3(2) p. 709. (Of course, the "great weight" spoken of must mean "great" within the context of legislative history itself; how much weight that should be given in the first place is a separate question.)

In the case at bar, the Court will examine the Senate Committee on Agriculture Report, S.Rep. No. 230, 100th Cong., 1st Sess. (1987) U.S.Code Cong. & Admin.News 1987 at 2723. The report notes that "previous owners must be notified by certified mail of the right of first refusal, within 15 days of when the System elects to sell acquired property." *Id.* at 34. It is significant that the report notes that the previous owner is notified of a "right of first refusal"—not of a right to go through the appraisal process of subsection (b). The report further observes that "whether the sale is by auction,

contract or otherwise the previous owner will have an opportunity to buy-back or lease-back the property." *Id.* at 35. This clearly seems to contemplate that the auction, lease, and direct-sale procedures stand on an equal footing, not that any one of them is subservient to another. "It is the intent of the Committee that the former owner be given one opportunity to lease back or buy back the property." *Id.* If anything, this contradicts the idea that former owners should have two different rights occurring at different times. Nowhere in the 260 pages of the report is there language to suggest that the former owner enjoys rights that are "consecutive" or "sequential" or are incorporated in a "two-step process." Surely some such language would have been present if this important distinction had been intended. And even if it were, as observed in the analysis of legislative history in general, *supra*, the possibility would exist that it had been planted by behind-the-scenes lobbying by politically active groups seeking to extend the application of the statute beyond what Congress contemplated. Here, the farm lobby, a politically potent group if ever there was one, was not able (or did not then intend) to plant such language in an Agriculture Committee report. The conclusion seems inescapable that the two-step process Plaintiff urges was not the intent of either the Congress or the Committee, but was invented after the fact by legitimate farm interests in an effort to extend their rights, or at least take advantage of statutory ambiguity to move toward the same goal.

One other piece of legislative history should be considered. That is the Mark-up Session of the Senate Subcommittee on Agricultural Credit on October 14, 1987. It contains remarks by Mr. Sims, President of the Farm Credit Bank of St. Louis and the FCS spokesman at the mark-up sessions. Sims made some statements which could be construed as supporting Plaintiff's position, namely, that the meaning of the bill was that the right of first refusal requires "the lender to determine the price of that property and offer it to the previous [owner]...." However, it is not clear that he

meant the bank must do this anytime they decide to alienate the property, rather than that this right applies only when the bank decided to proceed with a private sale. Indeed, such a conclusion is undercut by the language of the statute itself; the bank is allowed to lease, rather than sell, the property. No one suggests that the previous owner has a right to force the bank to sell the land back to him outright rather than lease it out. In any event, the Mark-up Session contains remarks from witnesses and individual Senators which are of questionable authority, as there is nothing to say that the full Senate, or even the full Agriculture Committee, adopted any of the particular views expressed in it, or even were aware of what was said. "Unlike statements from committee reports, statements made during committee hearings and floor debates have traditionally been given very little weight by courts and commentators." Eskridge & Frickey, *Legislation* Ch. 7, § 3A(3) p. 717.

To summarize, the legislative history does not seem to support Plaintiff's view of the statute; in fact, rather the opposite. Certainly there is nothing there clearly to contravene FCA's administrative interpretation.

### IV. OTHER CASES

Two cases presenting the identical issue have arisen in the district courts of the Eighth Circuit. One was *Martinson v. Federal Land Bank of St. Paul*, No. A2–88–31 (D.N.D.) (Apr. 21, 1988). In that case, the Hon. Rodney J. Webb, United States District Court Judge for the District of North Dakota, delivered an oral opinion from the bench. Judge Webb remarked that the "procedure for sale of acquired real estate as outlined in [the Agricultural Credit Act] is clearly, unambiguously, and materially at odds with the procedure suggested by the defendants in this case ...;" that is, a procedure in effect identical to that proposed by the Defendant here. Judge Webb offered no analysis to support his conclusion, and did not later file a published written opinion.

The other case was *Leckband v. Federal Land Bank of St. Paul,* No. 3–88–167 (D.Minn.) (May 17, 1988). Here, the Hon. Edward J. Devitt, Senior United States District Court Judge for the District of Minnesota, also ruled against Federal Land Bank of St. Paul in a case presenting the identical issue, and filed a short written opinion noting that, "[a]fter reviewing the statute and relevant legislative history, the court finds plaintiff's interpretation correct." Again, no analysis was presented other than conclusory statements of Plaintiff's victory.

While this Court welcomes the assistance of its brother district courts in resolving difficult issues (even where, as here, they have no binding precedential effect in this Circuit), little assistance can be had from these two cases. (Nor has the Eighth Circuit yet ruled on either, both of which have been appealed.) This may well be because, as was observed in *Leckband,* final agency rulings had not yet been promulgated; perhaps the opinions would have been more exhaustive had the Eighth Circuit district courts had the benefit of the FCA's final regulations, as this Court does. In any event, I respectfully disagree with their conclusions.

## V. CONCLUSION

As the underlying facts are undisputed, the issue is whether they spell out circumstances under which Plaintiff may be granted relief under existing law. For the foregoing reasons, the Court finds that they do not. The Court will allow Defendants' motion to dismiss pursuant to Fed.R. Civ.P. 12(b)(6).

In view of the Court's ruling on Defendants' motion, Plaintiff's motions for a temporary restraining order, preliminary injunction and partial summary judgment will be dismissed for mootness.