868 F.2d 671
 29 Wage & Hour Cas. (BN 241, 57 USLW 2530,
111 Lab.Cas. P 35,178,
35 Cont.Cas.Fed. (CCH) 75,628
 Martin GRACEY, Klate Holt, John V. Hill, d/b/a The Klate
Holt Company, Plaintiffs-Appellees,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION
NO. 1340, AFL- CIO, Defendant-Appellant,
and
Paula V. Smith, Administrator, Wage & Hour Division,
Employment Standards Administration of the
Department of Labor; Anne McLaughlin,
Secretary, Department of
Labor, Defendants.
 No. 88-3074.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1988.
Decided March 1, 1989.
Rehearing and Rehearing In Banc Denied May 1, 1989.
 
 Terry Russell Yellig (Maria Makris-Gouvas, Sherman, Dunn, Cohen, Leifer & Counts, P.C., Jonathan Kronheim, U.S. Dept. of Labor, Washington, D.C., on brief), for defendant-appellant.
 Mark E. Levitt, Coral Gables, Fla. (James M. Blue, Hogg, Allen, Ryce, Norton & Blue, P.A., on brief), Tampa, Fla., for plaintiffs-appellees.
 Before PHILLIPS and WILKINSON, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 In this case we must determine if the Service Contract Act, 41 U.S.C. Secs. 351-58 (1987), permits the Secretary of Labor to set aside the wage and benefit provisions of a collective bargaining agreement if they are less than the prevailing rate in the locality for similar work. The district court held that the Act does not provide the Secretary authority to set aside the plain terms of a collective bargaining agreement, where the agreement provides for wages and benefits above or equal to those of its predecessor. We believe that the district court's interpretation of the statute is correct, and we affirm its judgment.
 
 I.
 
 2
 The facts of this case are not in dispute. The plaintiffs, Martin Gracey, Klate Holt and John V. Hill, d/b/a The Klate Holt Company (Holt), entered into a government contract with the National Aeronautical and Space Administration (NASA) at Langley Research Center in Hampton, Virginia. The Service Contract Act, 41 U.S.C. Secs. 351-58 (1987), governed this contract.
 
 
 3
 Local Union No. 1340, International Brotherhood of Electrical Workers, AFL-CIO (IBEW Local) is the certified bargaining representative of all Holt employees who perform maintenance work assigned by NASA at the Langley Research Center. On May 14, 1987, the IBEW Local filed a request with the Secretary of Labor for a hearing pursuant to Sec. 353(c) of the Act to determine whether the wages specified in its collective bargaining agreement with Holt were substantially at variance with those prevailing for similar services in the locality. The IBEW Local claimed the wages in the collective bargaining agreement were less than the wages prevailing for similar services in the locality and that the Secretary should require the company to pay the increased wages and benefits.
 
 
 4
 Subsequent to this filing, and after arms-length negotiations in June and July, 1987, a collective bargaining agreement, dated August 1, 1987, was entered into between the IBEW Local and Holt for one year, to continue year by year unless terminated by sixty days' prior notice. Significantly, the agreement raised wages and fringe benefits above those of the prior collective bargaining agreement between the parties.
 
 
 5
 On September 3, 1987, the Administrator of the U.S. Department of Labor's Wage and Hour Division issued an order of reference for assignment of IBEW Local's request to an administrative law judge. On February 11, 1988, Holt simultaneously filed with the Administrator a motion to withdraw the order of reference, and with the administrative law judge a motion to dismiss the order of reference or, in the alternative, for an indefinite stay in the proceedings. Both motions were denied.
 
 
 6
 On March 11, 1988, Holt filed this suit in the Eastern District of Virginia seeking to enjoin the defendant, the Secretary and Administrator, from holding a variance hearing pursuant to Sec. 353(c). On April 1, the district court entered an order joining the IBEW Local as a party defendant and granting summary judgment to Holt. The court held that the Service Contract Act "does not confer authority on the Secretary of Labor to hold a hearing for the purpose of determining whether to set aside wage and fringe benefit provisions of an operative collective bargaining agreement which was bargained for at arms length, except as provided, either expressly or by reasonable implication, in Section 353(c)." Because the plain language of Sec. 353(c) addressed only the situation, not present here, in which wages and benefits in a successor agreement were below those contained in the predecessor agreement, the court held the Secretary was not empowered to disregard the bargain reached by the parties. The IBEW Local filed a notice of appeal, as did the Secretary. The Secretary, however, subsequently moved to dismiss her appeal and did not file a brief in this case nor participate in these proceedings.
 
 II.
 
 7
 The Service Contract Act of 1965, 41 U.S.C. Secs. 351-58 (1987), was enacted to provide wage and safety protection for "employees of contractors and subcontractors furnishing services to or performing maintenance services for Federal agencies." S.Rep. No. 798, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.Code Cong. & Admin.News 3737, 3737. When enacted, the service contract was the only remaining category of federal contracts to which comprehensive labor standards protection did not apply. Workers on federal construction contracts were protected under the Davis-Bacon Act, 40 U.S.C. Secs. 276a-276a-5 (1985), enacted in 1931, while those performing work under federal supply contracts were covered by the Walsh-Healey Public Contracts Act, 41 U.S.C. Secs. 35-45 (1985), passed in 1936.
 
 A.
 
 8
 Section 353(c) of the Service Contract Act is the operative provision at issue. It provides:
 
 
 9
 No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: Provided, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.
 
 
 10
 41 U.S.C. Sec. 353(c) (1987).
 
 
 11
 The union urges, relying primarily on the proviso, that Sec. 353(c) gives the Secretary the authority to convene a hearing and to adjust wages if she finds that collectively bargained wages and fringe benefits are below those prevailing for like services in the locality. It argues further that a hearing and upward adjustment of wages is proper here because IBEW Local members are paid wages and benefits below those prevailing in the locality for similar services. We hold, to the contrary, that the collective bargaining agreement governs wage and benefit levels in this case.[1]
 
 
 12
 Section 353(c) provides a wage and fringe benefit floor by requiring wages in a successor arms-length agreement to be "no less than the wages and fringe benefits, ... to which such service employees would have been entitled if they were employed under the predecessor contract." This obligatory floor for the successor contract is quite different from an obligation to pay at the wage rate prevailing in a particular locality. As the district court recognized, Sec. 353(c) only "proscribes the provision of lower wages and benefits in successor collective bargaining agreements than those wages and benefits contained in predecessor agreements thus providing a minimum wage and benefit rate." See also Locals 666 and 780 v. United States Dept. of Labor, 760 F.2d 141, 144 (7th Cir.1985) ("The status of predecessor employees is only relevant in establishing a wage and benefit floor for successor contracts.").
 
 
 13
 It is undisputed that Holt complied with its obligation under Sec. 353(c). Holt did not seek to reduce wages and benefits below this statutory minimum. The wages and benefits agreed upon in the successor agreement were higher than the amounts under the predecessor contract.
 
 
 14
 The union, however, focuses upon the proviso. The proviso states that the obligation to pay at or above the predecessor contract rates "shall not apply if the Secretary finds after a hearing ... that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality." IBEW argues that this language permits the Secretary to hold a hearing whenever wage rates are substantially at variance with those in the locality.
 
 
 15
 We disagree. The proviso by its terms speaks solely to the employer's basic obligation, viz. to provide wage and benefit levels equal to or above those of the predecessor agreement. The proviso then sets forth one situation in which this basic obligation shall not apply--namely, when the employer is already paying wages that exceed prevailing rates. The proviso thus permits the Secretary to suspend the wage and fringe benefit floor of the predecessor contract only when wages and benefits are already higher than local rates for similar services. The Secretary cannot require the contractor to pay more than the wage floor. In the instant case, the contractor had concededly met its statutory obligation, and so the proviso for suspension of that obligation simply does not operate.
 
 
 16
 The legislative history and the administrative regulations support such a reading of Sec. 353(c). That section was added as an amendment to the Act in 1972. The Senate Report on the 1972 amendments to the Act indicates the intent of Congress to make the predecessor contract a wage floor in order to "assur[e] that employees working for service contractors ... will have wages and fringe benefits under a new service contract no lower than those under their current agreement." S.Rep. No. 1131, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 3534, 3534. Other language demonstrates that under Sec. 353(c) Congress intended the predecessor contract to be the only wage floor. The Senate Report suggests that "[t]his provision should not be construed to confer windfall benefits," id. at 3537, and that Sec. 353(c) "[o]rdinarily requires successor contractors to pay service employees wages and fringe benefits that are no lower than their wages and fringe benefits under the current contract." Id. at 3534 (emphasis added). The word "ordinarily" suggests that the Secretary can suspend the employer's usual obligation to meet the wage levels of the predecessor contract only in the unusual circumstances where wages and benefits were reduced from prior levels but nonetheless remained above those prevailing in the locality.
 
 
 17
 The only relevant statements at the time Sec. 353(c) was passed indicate that the purpose of that section was to remedy the practice of underbidding for government contracts by slashing wages. Senator Gurney of Florida stated that the bill accomplished this by "merely requir[ing] that a successful bidder on a service contract cannot pay employees less than they were receiving from their former employer unless his wages are out of line." 118 Cong.Rec. 30949, 31282 (1972). There is no indication the Act was intended to protect workers under a bargaining agreement by the Secretary's enforcement of prevailing wage rates; rather the Act requires "that any assuming contractor maintain the level of wages and fringe benefits which the workers have achieved." (Statement of Senator Gurney on behalf of himself and Senator Williams of New Jersey, co-sponsor of the legislation and chairman of the Senate Committee on Labor and Public Welfare) 118 Cong.Rec. 23915, 24813 (1972).
 
 
 18
 Finally, Federal Regulation, 29 C.F.R. Sec. 4.163(a) (1988), supports this interpretation of the statute. In discussing Sec. 353(c), the Secretary states:
 
 
 19
 Under this provision, the successor contractor's sole obligation is to insure that all service employees are paid not less than the wages and fringe benefits to which such employees would have been entitled if employed under the predecessor's collective bargaining agreement.
 
 
 20
 Paying at or above the wage floor is the contractor's "sole obligation." There is no suggestion of an obligation to pay at the prevailing local rate in the Secretary's own regulation.[2]
 
 B.
 
 21
 The language and legislative history of Sec. 353(c) illuminate the congressional intent. It is appropriate also to read Sec. 353(c) in conjunction with the entire Service Contract Act and the other legislation addressing collective bargaining agreements and labor standards in federal contracting. A court must endeavor to see a statute whole, not to construe statutory sections or phrases in isolation. Stafford v. Briggs, 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980). Here the 1972 amendments in Secs. 351(a)(1) and 351(a)(2) and Sec. 353(c) "must be read in harmony to reflect the statutory scheme." S.Rep. No. 1131, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 3534, 3537; 29 C.F.R. Sec. 4.163(d) (1988); Trinity Services, Inc. v. Marshall, 593 F.2d 1250, 1253 (D.C.Cir.1978).
 
 
 22
 Sections 351(a)(1) and 351(a)(2) provide in pertinent part:
 
 
 23
 (a) Every contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, ... the principal purpose of which is to furnish services in the United States through the use of service employees, shall contain the following:
 
 
 24
 (1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder, as determined by the Secretary, or his authorized representative, in accordance with prevailing rates for such employees in the locality, or, where a collective-bargaining agreement covers any such service employees, in accordance with the rates for such employees provided for in such agreement, including prospective wage increases provided for in such agreement as a result of arm's-length negotiations....
 
 
 25
 (2) A provision specifying the fringe benefits to be furnished the various classes of service employees, engaged in the performance of the contract or any subcontract thereunder, as determined by the Secretary or his authorized representative to be prevailing for such employees in the locality, or, where a collective-bargaining agreement covers any such service employees, to be provided for in such agreement, including prospective fringe benefit increases provided for in such agreement as a result of arm's-length negotiations.
 
 
 26
 41 U.S.C. Sec. 351 (1987) (emphasis added).
 
 
 27
 The use of the disjunctive is critical. As the district court noted, if Congress "intended the collective bargaining agreements to be ineffective whenever the prevailing rate varies substantially, then it would not have disjunctively provided collective bargaining as an alternative method for establishing fair wages and benefits." Recognizing that the National Labor Relations Act, 29 U.S.C. Sec. 151 (1987), "encourages the practice and procedure of collective bargaining," Congress drafted Sec. 353(c) to permit the Secretary to disregard the bargaining agreement only when wages in a successor agreement fall below those of the predecessor contract. The statute does not encumber either the competitive bidding or the collective bargaining process to the extent appellant suggests. Certainly it does not contemplate that an arms-length bargaining agreement would be reached, only to be routinely abrogated in another forum. Instead, the collective bargaining agreement is explicitly assumed to establish the wage and benefit levels for service employees so long as the requirements of Sec. 353(c) and the minimum wage established by the Fair Labor Standards Act, 29 U.S.C. Sec. 206(a)(1) (1978) are met. The legislative history is just as explicit as the language of the statute. The analysis of Sec. 351 in the 1972 Senate Report notes that subsection (a) provides "that, in cases where a collective bargaining agreement covers the service employees, the minimum monetary wages to be paid the various classes of employees shall be in accordance with the rates provided for in the collective bargaining agreement...." S.Rep. No. 1131, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 3534, 3535.
 
 
 28
 The language of the Davis-Bacon Act, 40 U.S.C. Secs. 276a-276a-5 (1985), and the Walsh-Healey Public Contracts Act, 41 U.S.C. Secs. 35-45 (1985), further sustains this reading of the Act. The Davis-Bacon Act provides that workers will be paid "wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State in which the work is to be performed...." 40 U.S.C. Sec. 276a(a) (1985). There is no provision, however, in that legislation for the collective bargaining process to operate as an alternative means for establishing wages and benefits.
 
 
 29
 Likewise, the pertinent section in Walsh-Healey provides that employees must be paid "not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work...." 41 U.S.C. Sec. 35 (1985) (emphasis added). Again, Congress did not include in this legislation language comparable to the collective bargaining provisions of the Service Contract Act. The Service Contract Act is not, therefore, a strict prevailing wage statute; Congress intended a prevailing wage to be set by the Secretary only when a collective bargaining agreement had failed to make wage and benefit provisions.[3]
 
 III.
 
 30
 The language, context, and legislative history of the Service Contract Act lead to but one conclusion: the wage and benefit levels of a successor agreement must at least meet those of its predecessor. If, as in this case, that obligation is met, no power vests in the Secretary to set aside an arms-length collective bargaining agreement solely because wages are below the prevailing rate. While the Secretary had advanced a different interpretation of this legislation in the district court, she has not participated in this appeal for reasons which do not appear in the record. Courts are in any event sworn to safeguard the clear and unambiguous intent of Congress, administrative interpretations to the contrary notwithstanding. Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). Because Congress has clearly expressed its intentions in this case, we affirm the judgment of the district court.
 
 
 31
 AFFIRMED.
 
 PHILLIPS, Circuit Judge, dissenting:
 
 32
 The majority concludes that Sec. 4(c) of the McNamara-O'Hara Service Contract Act (the Act), 41 U.S.C. Sec. 353(c), provides for downward adjustments of wages alone--that is, for administrative abrogation of the express terms of a collective bargaining agreement only where the agreement provides for wages which substantially exceed those paid in the local community for similar services. The substance of the court's holding, then, is that the statute's wage adjustment mechanism permits only adjustments that favor employers. I am persuaded, however, that on this point the language of Sec. 353(c) is patently ambiguous. In that circumstance, we should defer to the Labor Department's long-standing contrary interpretation of the provisions of the Act in issue, as well as to contrary indications of congressional intent as reflected in the legislative history. With all respect, therefore, I dissent.
 
 
 33
 * First off, I disagree with the majority's assertion that "Congress has clearly expressed its intentions in this case," if by that it is suggested that it has done so through the express language of the statute.[1] 1] Slip op. at 677. To the contrary, I think Sec. 353(c) is so patently ambiguous as to make impossible its proper interpretation without resort to outside interpretative aids.
 
 
 34
 Complexity of text may too often and too easily be mistaken for clarity and precision. Inspection of even the most detailed and facially comprehensive statutory text may raise and leave unanswered fundamental questions about the legal obligations and rights of those subject to a statute's commands. The resulting problem may reflect not so much a failure to think the matter through as a failure to communicate what was intended after thinking it through. "Congress may intend to be precise, yet fail for want of a grammarian."[2] Whatever the cause, the problem of interpretation is the same for us, and we confront it here with a vengeance. Section 353(c) of the Service Contract Act consists of but one lengthy and convoluted sentence:
 
 
 35
 No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: Provided, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.
 
 
 36
 41 U.S.C. Sec. 353(c). When literal meaning is sought, at least three fundamental, logically intractable questions are presented. Each challenges any perception that the provision is sufficiently clear to permit a literal interpretation; taken together they completely refute the possibility. First, what are the "obligations" that "shall not apply" pursuant to the substantial variance proviso? Second, why does the proviso speak generally to wages "substantially at variance" with those prevailing in the local community if adjustment of such wages is permissible, as the majority concludes, only when they exceed prevailing rates? Finally, and most importantly, in what particular "circumstances" is the proviso triggered?
 
 
 37
 * The majority insists that the proviso is designed to provide relief from a "sole obligation"--namely, a contractor's duty under the preceding language of Sec. 353(c) to pay service employees "no less than" the wages to which they would have been entitled pursuant to a "predecessor" contract. Slip op. at 675. Of course, the question then remains why the proviso uses the plural "obligations."
 
 
 38
 The question is not a mere quibble. Concededly, the prohibitory language of Sec. 353(c) itself "speaks solely to the employer's ... obligation ... to provide wage and benefit levels equal to or above those of [a] predecessor agreement." Id. at 674. Looking to the rest of the statute, however--as we must--we find that this obligation is not the only wage standard to be found in the four corners of the statute. Provisions which precede Sec. 353(c) require contractors to pay wages "in accordance with prevailing rates for [other] employees in the locality, or, where a collective-bargaining agreement covers any such ... employees, in accordance with the rates for such employees provided for in such agreement." 41 U.S.C. Sec. 351(a)(1); cf. id. Sec. 351(a)(2) (similar standard applicable to provision of fringe benefits). In all cases, moreover, a contractor must pay at least the federal minimum wage. Id. Sec. 351(b)(1). The point is that the Sec. 353(c) proviso's plural reference to "obligations" plausibly encompasses the Act's full range of wage protection standards, which usually require adherence to the terms of extant collective bargaining agreements. Thus, for present purposes, the proviso might be read to mean that, in certain circumstances, such bargaining agreements "shall not apply"--that is, shall not serve as the standard against which the sufficiency of wage rates will be measured.[3]
 
 B
 
 39
 Equally ambiguous is the proviso's use of the phrase "substantially at variance." The majority's conclusion essentially is that the proviso authorizes the Secretary to order wage rate adjustments only where an employer seeks to pay less than the wages fixed by a "predecessor" service contract. In other words, adjustments may be made only where a predecessor contractor paid wages which substantially exceed those now prevailing in the local community. The difficulty, however, is that this reading does not account for the proviso's requirement that the Secretary determine whether the wages payable under a predecessor's contract are "at variance " with those which prevail in the locality. If the sole purpose of conducting a hearing pursuant to the Sec. 353(c) proviso is to determine whether a contractor may adjust wages downward, why is not the determination required by the statute posed as whether locally prevailing wages are "substantially less than" (rather than "substantially at variance with") those payable under the predecessor contract? Section 353(c) would appear, in other words, to permit broader administrative inquiry than is necessary to serve what the majority claims is the narrow purpose of the proviso. In turn, the language casts doubt on the majority's broad assertion that the Act was not meant to be a "prevailing wage statute." Slip op. at 677.
 
 C
 
 40
 Lastly, the language of Sec. 353(c) is ambiguous as to the "circumstances" which invoke the proviso. The majority resolves the ambiguity by referring to the "effect" of the proviso, which it says is to relieve an employer of his "obligation" to pay no less than the wages set by a predecessor contractor. If an employer is already complying with this duty, says the majority, the proviso "simply does not operate." Id. at 674.
 
 
 41
 But on my reading, such an interpretation wrongly focuses solely on the phrase "such obligations shall not apply." The more relevant language expressing the circumstances which invoke the proviso is that found in the next phrase--"if the Secretary determines." From this I would claim, if not a better literal reading, at least an equally plausible reading that the only express precondition to operation of the proviso is an administrative determination that wages to be paid by a contractor vary substantially from those prevailing locally.
 
 
 42
 More importantly, the majority's analysis at some point puts the cart before the horse, primarily by drawing conclusions with respect to the proviso's effect on the basis of a questionable assumption about who might be interested in seeking its protection. The faulty premise is that the proviso provides "relief" for employers from certain of their "obligations." In my view, however, it is at least equally plausible to read the proviso simply as substituting one "obligation" for another. If a contractor need not, by virtue of the proviso, pay employees according to a predecessor's wage rate schedules, it must still pay according to rates prevailing in the community. Of course, "substitution" of this latter obligation might, depending on the circumstances, be in the ultimate best interest of any party. This reading treats the Act as establishing a system of "fallback" wage standards, and of course suggests that the Sec. 353(c) proviso inures to the benefit of employers and employees alike.
 
 II
 
 43
 In the face of such patent ambiguities, we first must give deference to "reasonable" agency interpretations of the relevant statute. "A reviewing court is ... to be guided by the 'venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....' " E.I. duPont de Nemours & Co. v. Collins, 432 U.S. 46, 54-55, 97 S.Ct. 2229, 2234-35, 53 L.Ed.2d 100 (1977), (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). Indeed, our role is highly circumscribed. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), and courts "should not disturb" an agency's interpretation "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 2782, 6 L.Ed.2d 908 (1961). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citations omitted). Instead, courts must determine only whether the agency's interpretation of the statute is "reasonable." Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).
 
 
 44
 Based upon the statute's text as illuminated by relevant evidence of congressional intent, I am persuaded that the Secretary's consistent and long-standing interpretation of Sec. 353(c)--which stands wholly at odds with the majority's reading of the statute--is not only "reasonable" but correct. That it is at odds with the majority's interpretation is plain, both in Department regulations and rulings.
 
 
 45
 First, the Department's regulations governing Sec. 353(c) "substantial variance" hearings clearly contemplate suspension of the Sec. 351(a)(1) minimum wage standards and, in turn, the wage provisions of an operative collective bargaining agreement. See 29 C.F.R. Sec. 4.10(a). They expressly provide that "[a] request for a hearing ... may be made by the contracting agency or other person affected or interested, including contractors or prospective contractors and associations of contractors, representatives of employees, and other interested Governmental agencies." Id. Sec. 4.10(b)(1)(i) (emphasis supplied). Thus, the Department's regulations are patently inconsistent with the majority's conclusion that Sec. 353(c) substantial variance hearings may be held only where a contractor seeks relief from its obligation to pay wages not less than those paid under predecessor contracts.
 
 
 46
 Second, the Department has repeatedly rejected employers' claims that substantial variance hearings may not be held in circumstances where a union seeks an upward adjustment of wage rates fixed by collective bargaining agreements. Shortly after Congress enacted Sec. 353(c), a Labor Department administrative law judge responded to such a claim as follows:
 
 
 47
 I do not read nor construe Sec. (c) of the Act as being so clear that it permits only a lower and not an upward wage adjustment when the predecessor contract collectively bargained wage rates are incorporated in a successor contract and found to be at substantial variance with those which prevail for services of a character similar in the locality as urged.
 
 
 48
 ....
 
 
 49
 [T]he language of the amendment to the Act, and the supporting legislative history and findings are quite consistent as reflecting that the statement [the Sec. 353(c) proviso] not be construed as authorizing a wage adjustment only when the predecessor wage rates substantially exceed the prevailing local rate....
 
 
 50
 In re Applicability of Collectively Bargained Wage Rates (Patrick Air Force Base ), SCA-CBV-3, slip op. at 11, 14-15 (Aug. 7, 1973). See also In re Applicability of Collectively Bargained Wages (IBEW, Local 2088 ), 22 Wage & Hour Cas. (BNA) 831, 833 n. 2 (1974) (same). The Department clearly considers this interpretation of the Sec. 353(c) proviso to be "settled." In connection with the present litigation, the Administrator of the Department's Wage and Hour Division rendered a definitive statement of the Secretary's interpretation of the Sec. 353(c) substantial variance proviso.
 
 
 51
 It has been the consistent policy of the Wage and Hour Division to hold substantial variance hearings for the purpose of determining whether collectively bargained wages are below those prevailing in the locality since the enactment of Section (c) in 1972.
 
 
 52
 Letter from Paula V. Smith, Division Administrator to Counsel for the Klate Holt Company, at 3 (March 25, 1988) (Supplemental Joint Appendix at 4) (emphasis supplied).
 
 
 53
 This agency interpretation, consistently maintained over a long period, more than plausibly reconciles the ambiguities in the statute's language. It therefore satisfies the reasonableness standard and is entitled to our deference, even were we to think we had a "more reasonable" interpretation of the statute. "[T]he task for the Court of Appeals [is] not to interpret the statute as it [thinks] best but rather the narrower inquiry into whether the [agency's] construction [is] 'sufficiently reasonable' to be accepted by a reviewing court." FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).[4]
 
 III
 
 54
 The legislative history of Sec. 353(c), normally the best extratextual evidence of an ambiguous statute's meaning, see, e.g., Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); Baltimore Gas & Elec. Co. v. Heintz, 760 F.2d 1408, 1413 (4th Cir.1985), confirms the reasonableness of the Secretary's interpretation. Indeed it supplies a compelling guide to a direct interpretation of this ambiguous statute at odds with that of the majority here.
 
 
 55
 Section 353(c) was the central feature of extensive amendments to the Service Contract Act passed by Congress in 1972. See Pub.L. No. 92-473, Sec. 3(b), 86 Stat. 789 (1972). The legislative history of the 1972 amendments indicates that Congress was primarily concerned, as it was when the statute was originally enacted, with ensuring that employees be paid according to locally prevailing wage rates. Indeed, the House and Senate committee reports accompanying the amendments show that, contrary to the majority's suggestion, Congress meant for the Act to operate as a "prevailing wage standards" statute.
 
 
 56
 The Service Contract Act was enacted to provide wages and safety protection for employees working under Government service contracts. It makes the Department of Labor responsible for assuring that service employees are paid at least the prevailing wages and fringe benefits for the same work in their locality as others are paid, so that his [sic] is simply a wage standards protection statute.
 
 
 57
 S.Rep. No. 1131, 92d Cong., 2d Sess. reprinted in 1972 U.S.Code Cong. & Admin.News 3534, 3534 (emphasis supplied) (statement of Act's purpose).
 
 
 58
 The Senate Report's "Section-by-Section Analysis" of the amendments also indicate that Congress meant to vest the Secretary with much broader authority than the majority has concluded. It is clear, for example, that the Sec. 353(c) proviso was meant to suspend, in appropriate circumstances, not only the substantive obligation imposed by Sec. 353(c) itself, but also the general wage and benefit standards found in Secs. 351(a)(1) and (2). The report explicitly characterizes the remedial language of Sec. 353(c) as "a proviso that the provisions of this subsection [353(c) ] and sections [351 ](a )(1 ) and [351 ](a )(2 ) will not apply if the Secretary finds after a hearing that [the] wages and fringe benefits [required to be paid thereunder] are substantially at variance with those which prevail for services of a character similar in the locality." Id. at 3536 (emphasis supplied). See also id. at 3537 ("It is the intention of the committee that sections (a)(1) and (a)(2) and (c) be so construed that the proviso in section (c) applies equally to all of the above provisions."). Sections 351(a)(1) and (2) establish minimum wage standards and require, by their terms, adherence to the provisions of extant collective bargaining agreements. Thus, insofar as the Sec. 353(c) proviso makes Secs. 351(a)(1) and (2) inapplicable, it abrogates the terms of such agreements. In turn, the proviso authorizes the Secretary to order rate adjustments whenever the wages to be paid under collective bargaining agreements are "substantially at variance" with those prevailing in the local community.
 
 
 59
 The majority protests that "[t]he statute does not encumber ... the collective bargaining process to the extent [IBEW] suggests. Certainly it does not contemplate that an armslength bargaining agreement would be reached, only to be routinely abrogated in another forum." Slip op. at 676. It appears, however, that such a result is precisely what Congress had in mind, at least in situations where the parties have, for whatever reason, contracted for wages which do not comport with locally prevailing rates of pay.
 
 
 60
 Ordinarily, where service employees are covered by a collective bargaining agreement, a successor contractor furnishing substantially the same services at the same location will be obligated to pay to such service employees no less than wages and fringe benefits required by such agreement.
 
 
 61
 ....
 
 
 62
 This provision should not be construed to confer windfall benefits.
 
 
 63
 However, the committee was concerned about safeguarding against any possible abuse. There are certain unusual circumstances where predetermination of wages and fringe benefits contained in ... a collective agreement might not be in the best interest of the worker or the public.
 
 
 64
 ....
 
 
 65
 For example, a union and an employer may enter into a contract, calling for wages and fringe benefits substantially lower than the rates presently prevailing for similar services in the locality. Likewise, a union and employer may reach an agreement providing for future increases substantially in excess of any justifiable increases in the industry. Finally, it is possible that over a long period of time, predetermined contractual rates might become substantially at variance with those actually prevailing for services of a character similar in the locality.
 
 
 66
 The committee concluded that the dual objectives of protecting the service worker and safeguarding other legitimate interests of the federal government could best be achieved by requiring the Secretary to predetermine the wages and fringe benefits contained in the collective agreement, except in the instance where he finds, after notice to interested parties, and a hearing, that the record discloses by a clear showing that such contractual wages and fringe benefits are substantially at variance with those prevailing for services of a character similar in the locality.
 
 
 67
 ....
 
 
 68
 Clearly, contractual wages and fringe benefits shall continue to be honored ..., unless and until the Secretary finds, after hearing, that such wages and fringe benefits are substantially at variance with those prevailing in the locality for like services.
 
 
 69
 Id. at 3537-38 (emphasis supplied). Discussing the first sentence of the quoted passage, the majority places heavy emphasis on the word "ordinarily," arguing that the collective bargaining agreement is the touchstone of the Act's wage standards. For our purposes, however, I would place greater emphasis on the words "however," "except" and "unless." Congress has made it clear that, in specified circumstances, the Act gives the Secretary broad authority to adjust contractual wage rates. Such circumstances expressly include those in which locally prevailing rates substantially exceed those set by collective bargaining agreements. The legislative history thus compels the conclusion that, contrary to the majority's holding, the Sec. 353(c) "substantial variance" proviso authorizes the Secretary to order upward adjustments to wages.[5]
 
 IV
 
 70
 The interpretation above suggested is also compelled by considering which of the possible interpretations of this ambiguous provision is most consistent with the policies Congress sought to advance by this Act. "Our duty ... is 'to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " Commissioner v. Engle, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984), (quoting NLRB v. Lion Oil Co., 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)).
 
 
 71
 Courts construing the Act have agreed that one of its general purposes is "to insure that service employees working on government contracts are not paid wages below the prevailing wages being paid in the locality by non-government contractors." International Ass'n of Mach. & Aeronautics Workers v. Hodgson, 515 F.2d 373, 375 (D.C.Cir.1975). See also AFL-CIO v. Donovan, 582 F.Supp. 1015, 1024 (D.D.C.1984) ("a primary intent of Congress was 'to prevent Government contracts from disrupting local wage standards' "); Berry v. Andrews, 535 F.Supp. 1317, 1318 (M.D.Ala.1982) ("The purpose of the SCA is to require contractors to pay their employees working on a federal service contract in accordance with the prevailing rate and benefits for such employees in the locality.").
 
 
 72
 The Act was enacted, in other words, for the protection of employees. The majority recognizes as much, slip op. at 673, but reaches a result wholly at odds with this purpose. The court's holding is that employees working under government service contracts are completely foreclosed from seeking upward adjustments of wage rates. Under this logic, the Sec. 353(c) proviso abrogates the terms of collective bargaining agreements only when the interests of employers would thereby be served. In my view, Congress did not intend such a result.
 
 V
 
 73
 For the foregoing reasons, I believe that Sec. 353(c) permits the Department of Labor to order rate adjustments in any case where it finds that wages set by collective bargaining agreements are "substantially at variance" with those prevailing in the local community--notwithstanding whether the interests to be served thereby are those of a service contractor or its employees. I would therefore reverse and remand with directions to enter judgment for IBEW, permitting the Secretary to go forward as she proposed with a Sec. 353(c) substantial variance hearing.
 
 
 
 [1]
 The defendant also attacks the district court's subject matter jurisdiction over this action. It argues that plaintiffs are not entitled to "judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-64, 82 L.Ed. 638 (1938). This argument is misplaced. If an agency acts in clear derogation of its statutory authority, a court need not wait for the underlying proceedings to conclude to intervene. Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 183, 3 L.Ed.2d 210 (1958); Mayor and City Council of Baltimore v. Mathews, 562 F.2d 914, 920 (4th Cir.1977)
 
 
 [2]
 Our dissenting brother seizes upon the plural form of "obligations" and concludes that Congress had in mind multiple obligations when it drafted the proviso. This ignores, however, the fact that the proviso immediately follows the discussion of the employer's obligation not to provide wages and benefits less than those of the successor contract. Indeed, the proviso is separated from the substantive obligation to which it refers only by a colon. To make the reference to the preceding duty even clearer, the word "obligations" is preceded by the word "such." Moreover, the plural form of the word "obligation" is readily understood as referring to the various payment obligations, i.e., accrued wages, fringe benefits, increases in wages and benefits, mentioned in Sec. 353(c), without any need to distort the context of the proviso by having it apply to x, y, or z obligations (or any combination thereof) that may appear throughout the Act. It cannot be that Congress meant to suspend the obligation to pay minimum wages in accordance with the Fair Labor Standards Act under any circumstances. Yet the dissent somehow presumes that this is one of the obligations to which the proviso's suspension would apply
 With respect, the interpretation of our dissenting brother has simply overlooked the statutory context in which the proviso is set.
 
 
 [3]
 Our dissenting brother would simply ignore the entire collective bargaining process whenever it produced a result which the Secretary determined to be at variance with "prevailing wages" in the community. We think a reading of the statute in its entirety indicates a fidelity to the collective bargaining process on the part of Congress and a preference for agreements reached through arms-length negotiations save in the narrow circumstance when wage and benefit levels fall below those of the predecessor contract. The legislative history, to which the dissent refers, pertains to collective bargaining agreements that were not at arms-length. See S.Rep. No. 1131, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 3534, 3537. ("service employees should be protected against instances where the parties may not negotiate at arms length"). The collective bargaining process proceeded in good faith here. No question of a collusive agreement or unequal bargaining power has been raised. In such circumstances, Congress intended the commitment to collective bargaining, expressed in this and many other statutes, to operate
 The dissent states finally that the majority's interpretation of the Sec. 353(c) proviso is such that only the "interests of employers would thereby be served." The dissent ignores the fact that the obligation at issue falls solely upon the employer. By definition, therefore, any statutory provision for the suspension of that obligation would inure to the benefit of an employer. The overall purpose and operation of the statute remains, of course, one of wage protection for service contract employees.
 
 
 [1]
 This is not altogether clear. At times the majority opinion seems to be relying on a "plain meaning" analysis. But of course, in the end, it also resorts to elements of legislative history to bolster its interpretation--a course technically not required, nor indeed permitted, if the statute's text conveys a plain meaning. In the end perhaps we are in agreement that the provision in issue will not actually yield to a "plain meaning" interpretation
 
 
 [2]
 R. Ginsburg, A Plea for Legislative Review, 60 S.Cal.L.Rev. 995, 997 (1987)
 
 
 [3]
 As shall be seen, the legislative history quite explicitly indicates that this interpretation of the Sec. 353(c) proviso is in fact the correct one--hence that the asserted singular/plural distinction is far more significant than a casual reading might suggest. See Section III, infra
 
 
 [4]
 The majority fails to consider the Secretary's interpretation of Sec. 353(c), apparently on the grounds that she failed to participate in this appeal. Slip op. at 677. The record is devoid of any suggestion, however, that the Department has changed its position on the interpretive issues. We are in no position to speculate about the many imaginable reasons for the Secretary's abandonment of this case. So long as it is reasonable, we remain obliged to defer to the prevailing administrative construction of the statute
 
 
 [5]
 Simply by way of response, I would argue that the legislative history relied upon by the majority is inapposite. It consists of statements which are relevant to interpretation of the substantive obligations imposed by Secs. 351(a)(1), 351(a)(2) and 353(c), but which say nothing about the scope and applicability of the Sec. 353(c) substantial variance proviso